# IN THE SUPREME COURT OF TENNESSEE
## AT NASHVILLE
### June 3, 2004 Session

## STATE OF TENNESSEE v. CHRISTOPHER A. DAVIS

**Automatic Appeal from the Court of Criminal Appeals**
**Criminal Court for Davidson County**
**No. 96-B-866    J. Randall Wyatt, Judge**

---

**No. M2001-01866-SC-DDT-DD - Filed August 25, 2004**

---

The defendant, Christopher A. Davis, was convicted of two counts of premeditated first degree murder,[1] two counts of especially aggravated kidnapping, and two counts of especially aggravated robbery. The jury imposed death sentences for both counts of premeditated first degree murder after finding that evidence of three aggravating circumstances, i.e., (1) the defendant was previously convicted of one or more felonies whose statutory elements involved the use of violence to the person, (2) the murders were committed for the purpose of avoiding, interfering with, or preventing a lawful arrest of the defendant, and (3) the murders were knowingly committed, solicited, directed, or aided by the defendant while the defendant had a substantial role in committing or attempting to commit a robbery or kidnapping, outweighed evidence of mitigating circumstances beyond a reasonable doubt. In addition, the trial court sentenced the defendant to concurrent 25-year sentences for the especially aggravated kidnapping convictions to run consecutively to concurrent 25-year sentences for the especially aggravated robbery convictions.

After the Court of Criminal Appeals affirmed the convictions and the sentences, the case was automatically docketed in this Court. We entered an order specifying seven issues for oral argument, and we now hold as follows: (1) the evidence was sufficient to support the jury's verdicts; (2) the trial court did not err in refusing to disqualify the District Attorney General; (3) the trial court did not err in refusing to allow defense counsel to withdraw; (4) the death sentences were not invalid on the ground that the aggravating circumstances were not set out in the indictment; (5) the trial court did not err in allowing the prosecution to establish the "prior violent felony" aggravating circumstance by relying on an offense committed as a juvenile; (6) the evidence was sufficient to support the jury's finding of three aggravating circumstances beyond a reasonable doubt and its determination that the aggravating circumstances outweighed the evidence of mitigating circumstances beyond a reasonable doubt; and (7) the death sentences were not arbitrary or disproportionate. We also agree with the Court of Criminal Appeals' conclusions with respect to

---

[1] The defendant was also convicted of two counts of felony murder, but the trial court merged these convictions with the premeditated first degree murder convictions.

the remaining issues, the relevant portions of which are included in the appendix to this opinion. Accordingly, we affirm the judgment of the Court of Criminal Appeals.

 **Tenn. Code Ann. § 39-13-206(a)(1); Judgment of the Court of Criminal Appeals Affirmed**

E. RILEY ANDERSON, J., delivered the opinion of the court, in which FRANK F. DROWOTA, III, C.J. and JANICE M. HOLDER and WILLIAM M. BARKER, JJ., joined.  ADOLPHO A. BIRCH, JR, J., filed a dissenting opinion.

Hershell D. Koger, Pulaski, Tennessee, and David Hornik, Nashville, Tennessee, for the Appellant, Christopher A. Davis.

Paul G. Summers, Attorney General and Reporter; Michael E. Moore, Solicitor General; Mark A. Fulks, Assistant Attorney General; Victor S. Johnson, District Attorney General; and Tom Thurman and Katrin Miller, Assistant District Attorneys General, for the Appellee, State of Tennessee.


## OPINION

## BACKGROUND

Guilt Phase

On the early morning of February 28, 1996, the bodies of the victims, Gregory Ewing and D'Angelo Lee, were discovered in a remote part of a construction site in the Berry Hill area of Nashville, Tennessee.  Ewing had been shot seven times, including three gunshot wounds to his head.  Lee had been shot five times, including three gunshot wounds to his head.

As a result of an investigation, the defendant, Christopher A. Davis, was charged with two counts of premeditated first degree murder, two counts of felony murder, two counts of especially aggravated robbery, and two counts of especially aggravated kidnapping.  The evidence at the trial was as follows:

Antonio Cartwright, age 14, testified that on February 27, 1996, he was smoking marijuana in an apartment located on Herman Street in Nashville with the defendant, Christopher Davis, Yakou "Kay" Murphy, Gdongalay Berry, and an individual nicknamed "Sneak."  Davis told Cartwright that there was going to be a "highjacking . . . and a gun deal" that evening involving D'Angelo Lee and Gregory Ewing.  Davis told the others that he wanted Lee's car and planned to "draw down on him."  Davis told Cartwright that they would have to kill Lee and Ewing because the two victims knew where they lived.

Cartwright testified that when Davis, Berry, Murphy, and Sneak left the apartment on foot that evening, Davis was carrying a nine millimeter handgun and Berry was armed with a .45 caliber

handgun.[2] Davis and Berry returned in approximately one hour in a white Cadillac with four or five assault rifles, a pair of green tennis shoes with yellow laces, a black and blue jacket, an additional .45 caliber handgun, and a gold cross necklace. Davis told Cartwright that he had killed the two victims and that he had shot Lee nine times in the head. Davis said the bodies had been dumped where they could not be found. Berry said that they needed to burn the Cadillac.

Christopher Loyal testified that he saw Davis and Berry on the night of February 27, 1996, and that he helped carry assault rifles from a white Cadillac into Davis's room in the Herman Street apartment. Loyal saw a backpack with guns in it and noticed that Davis was wearing a gold chain with a cross on it. According to Loyal, Davis said that they had gone to get some guns and that he "unloaded his clip." Davis told Loyal that one of the victims had begun crying and begging for his life, and that they shot him. Loyal said that Berry seemed upset about what had happened but Davis just appeared "hyper."

Detectives Mike Roland and Pat Postiglione were assigned to investigate the homicides of Gregory Ewing and D'Angelo Lee after the victims were found on the morning of February 28, 1996. Later that morning, Postiglione, along with two other detectives, went to an apartment at 2716-B Herman Street to investigate a tip they received from "Crimestoppers" regarding an unrelated murder that had occurred near Tennessee State University ("TSU"). While the detectives were questioning Ronald Benedict, the lessee of the apartment, and fourteen-year-old Antonio Cartwright, they noticed a rifle under a bed in an adjacent room.

As the detectives were discussing a search of the apartment, Christopher Davis walked in unannounced with Dimitrice "Dee" Martin, Berry, and Brad Benedict, Ronald Benedict's brother. Davis was talking on a cell phone and one of the other men was carrying an assault rifle. When the detectives announced their presence and drew their weapons, Davis, Berry and Brad Benedict fled from the apartment. Davis was caught one block from the apartment. A .45 caliber automatic handgun that Davis had discarded during the chase and the assault rifle that one of the other men had been carrying were also recovered. Berry and Brad Benedict, however, were not apprehended that day.

Davis was arrested, taken back to the apartment on Herman Street, and placed in a patrol car while the apartment was searched. Davis denied that he lived in the apartment. The search of Davis's bedroom uncovered a nine millimeter handgun, an M-1 assault rifle, three SKS assault rifles, several handguns, ammunition, $1,400 in currency inside a Crown Royal bag, two pair of muddy gloves, muddy tennis shoes, handcuffs, a pager, a cell phone, and a backpack containing cans of spray paint. Detective Postiglione also saw a pair of green tennis shoes with yellow laces that were later identified as belonging to the victim, D'Angelo Lee.

---

[2] Harold Kirby testified that he had loaned Davis a nine millimeter handgun on the day before Davis was arrested for the murders of Ewing and Lee.

Davis was taken to the Criminal Justice Center in the back of a patrol car with Antonio Cartwright. Cartwright testified that while riding in the patrol car, Davis told him to remove the gold cross necklace from Davis's neck and to place it in Davis's pocket.

Dimitrice Martin testified that she was Davis's girlfriend. While she waited with Davis at the Criminal Justice Center, he asked her to take a gold cross necklace from his pocket and put it in her purse. Davis then told her that Berry and several others had purchased guns the previous night and had returned to the Herman Street apartment with the victims tied up in their car.[3] Davis told her that he and Berry then drove somewhere, took the victims from the car, and began shooting the victims. Davis also told her that Berry had shot both of the victims and that he, Davis, shot D'Angelo Lee. Davis then told Martin to call Ronald Benedict's girlfriend and ask her to "get rid of" a pair of green and gold tennis shoes left in the apartment. Finally, Martin testified that she received two letters from Davis following his arrest in which he told her to "take the fifth" and not testify against him or in cases involving other members of the Gangster Disciples.[4]

Detective Roland interviewed Davis regarding the homicides of Ewing and Lee. Because another detective had previously questioned Davis about the unrelated murder near the TSU campus, Roland confirmed that Davis had been advised of his rights and was willing to talk. Davis denied that he was involved in or had any knowledge of the Ewing and Lee homicides. Detective Roland stopped the interview after 30 minutes because Davis requested an attorney. According to Roland, however, he was later typing up criminal warrants to charge Davis with the Ewing and Lee homicides when Davis told him he wanted to talk to him.

Davis signed a written waiver of his rights and gave a videotaped statement. He said that Gdongalay Berry and Yakou "Kay" Murphy met with Ewing and Lee to buy guns and later returned in a Cadillac with the victims tied up in the car. After Berry brought the guns into the Herman Street apartment, Davis accompanied Berry and Murphy in the Cadillac to another location where they got the victims out of the car. Davis told Detective Roland that Berry shot Ewing five times with a .45 caliber handgun and that Murphy shot Lee four times in the back of the head with a nine millimeter handgun. Davis said that they returned to the Herman Street apartment after burning the car.[5]

---

[3] Martin testified that she had heard Davis and Lee discussing the purchase of guns on the evening of February 27, 1996. Later that evening, she saw Davis and Berry return to the apartment on Herman Street with assault rifles, green and gold tennis shoes, a coat, and a duffle bag.

[4] Martin testified that she had pending charges against her for murder, especially aggravated kidnapping, especially aggravated robbery, and eleven counts of aggravated robbery. She said that she had not been promised anything for her testimony, but she hoped her testimony would warrant consideration in her pending cases.

[5] Davis later sought suppression of his statements on the basis that he was feeling ill, that he did not recall being read his Miranda rights, and that officers had "coerced" Davis by showing him the evidence that was being collected and by telling him that others had been making statements about the offenses. The trial court denied the motion to suppress, and the Court of Criminal Appeals correctly affirmed the trial court's ruling.

The victims' family members identified evidence that was recovered from the investigation. Willie Mae Lee, D'Angelo Lee's mother, testified that the gold cross necklace that was being worn by Davis after the offenses had belonged to her son. Lee testified that her son had been wearing green tennis shoes with yellow laces when he borrowed her car, a white Cadillac, on the evening of February 27, 1996. Brenda Ewing Sanders, Gregory Ewing's mother, testified that a jacket found in the Herman Street apartment had belonged to her son.

The medical examiners who performed the autopsies of the victims were no longer employed by the medical examiner's office and lived out of state. As a result, Dr. Bruce Levy testified about their findings.[6] Dr. Levy testified that Gregory Ewing had been shot seven times, including three shots to his head. Bullets recovered from Ewing's shoulder and abdomen appeared to be a different caliber than one recovered from his head. Dr. Levy testified that D'Angelo Lee had been shot three times in the head and once or twice in the hands. One bullet was recovered from the hand wounds.

Tommy H. Heflin, the supervisor of firearms identification with the Tennessee Bureau of Investigation, testified that he received the bullets that had been recovered from the victims' bodies, a nine millimeter handgun, two .45 caliber handguns, four fired cartridges from a .45 caliber handgun, and eight fired cartridges from a nine millimeter handgun. Heflin concluded that the nine millimeter bullets recovered from the victims had been fired from the nine millimeter handgun that he tested. Although Heflin could not conclude with "absolute certainty" that the nine millimeter cartridges had been fired from the nine millimeter handgun that he tested, he concluded that they had been fired from that handgun or one very similar. Heflin testified that the four .45 caliber cartridges had been fired from the same handgun but not from the two .45 caliber handguns he had been given to examine. He likewise concluded that two .45 caliber bullets recovered from the victims had been fired from the same handgun.

Following the prosecution's case in chief, the defense presented the testimony of the defendant Davis's grandmother, Susie Boykin. Boykin, who lived five or six blocks from the Herman Street apartment, testified that on February 27, 1996, Gregory Ewing stopped by her house looking for Davis. When Davis later arrived at her house at about 7:00 p.m., she told him that Ewing was looking for him. Davis left but returned a short time later and said he could not find Ewing. According to Boykin, Davis ate dinner with her and stayed until 10:15 p.m. At that point, she asked Davis to stop coming in and out of the house because she needed to get to sleep.

Dallas Blackman testified that he saw Davis and Antonio Cartwright at the Court Villa apartments on February 27, 1996, sometime between 9:30 p.m. to 10:30 p.m. Blackman was with Davis and Cartwright for about 45 minutes. According to Blackman, Davis asked him to rent a motel room for him that evening, but that was not unusual.

---

[6] The trial court overruled objections to Dr. Levy's testimony made by defense counsel, and the Court of Criminal Appeals affirmed the trial court's ruling.

Donald Moore testified that Yakou Murphy told him that he killed Ewing and Lee after tying them up and making them get on their knees. According to Moore, Murphy said he never liked Ewing and that he had "set up" Davis, Berry, and Moore. Moore conceded that Murphy had testified against him in unrelated cases in which Moore was convicted of first degree murder, second degree murder, and especially aggravated robbery. Moore also acknowledged that he was Davis's best friend.

Yakou Murphy testified that he did not kill Ewing or Lee and that he was not involved in the murders. He also denied that he had told anyone he killed the victims. Murphy testified that Davis and Berry had asked him to go with them to buy guns and that he saw Davis and Berry driving a white Cadillac with two men who appeared to be tied up. Murphy testified that he knew Davis and Berry had handguns and that later that evening, he saw them carrying clothes, shoes, and assault rifles into the apartment.

The defendant, Christopher Davis, age 18 at the time of the offenses,[7] testified that he went to the home of his grandmother, Susie Boykin, at about 6:45 to 7:00 p.m. on February 27, 1996, and that he returned around 7:15 to 7:20 p.m. after leaving briefly to look for Ewing. Davis testified that he left his grandmother's house several times to smoke marijuana with Antonio Cartwright and to sell cocaine. Davis said that after leaving his grandmother's home around 10:15 p.m., he returned to his apartment on Herman Street where Yakou Murphy asked him to help carry guns and other items into Davis's bedroom. Davis testified that Murphy told him that he and Berry had robbed someone, and that Berry later said that he and Murphy shot Ewing and Lee. Davis stated that he purchased a necklace from Berry for $200. Davis testified that his statement to police was a "big lie," that he had not been feeling well in the days before his arrest, and that he had recently received a blood transfusion at Vanderbilt Hospital for an apparent spider bite.

Dr. Steven Wolff testified that Davis had been admitted at Vanderbilt on February 18, 1996, and had been given a blood transfusion to treat anemia. Wolff testified that Davis had a lesion on his arm that was consistent with a spider bite and that such a bite could result in anemia. Wolff testified that Davis did not appear to be in distress and that Davis had a normal red blood cell count when he was discharged.

After hearing the evidence and deliberating, the jury convicted Davis of two counts of premeditated first degree murder, two counts of felony murder, two counts of especially aggravated kidnapping, and two counts of especially aggravated robbery. After the trial court merged the felony murder convictions with the premeditated first degree murder convictions, a sentencing proceeding was conducted to determine punishment.

---

[7] Davis admitted that he was involved with the "Gangster Disciples" and that he had been selling cocaine since he was 13 or 14 years of age.

Sentencing Phase

In the sentencing phase of the trial, the prosecution relied on three aggravating circumstances in seeking the death penalty: that the defendant was previously convicted of one or more felonies whose statutory elements involved the use of violence to the person; that the murders were committed for the purpose of avoiding, interfering with, or preventing a lawful arrest; and that the murders were knowingly committed, solicited, directed, or aided by the defendant while the defendant had a substantial role in committing or attempting to commit a robbery or kidnapping. Tenn. Code Ann. § 39-13-204(i)(2), (6), and (7) (2003).

In support of the prior violent felony aggravating circumstance, the prosecution introduced evidence that Davis had prior convictions for first degree murder and attempted second degree murder. The prior first degree murder conviction occurred in 1999 and the prior attempted second degree murder conviction occurred in 1997.

In addition, the prosecution presented the testimony of Brenda Ewing Sanders, Gregory Ewing's mother, who testified that her son was 18 years old when he was killed. She testified that Ewing had been a "good boy," who had a young daughter. Similarly, Willie Mae Lee, D'Angelo Lee's mother, testified that her son was 19 years of age when he was killed and that she had a close relationship with him. She testified that her son had a six-year-old son who believed his father would come home after the trial.

The defense presented numerous witnesses in mitigation. The defendant's mother, Felicia Davis, testified that she had attended college and had maintained regular employment while the defendant's father, Christopher Davis, Sr., stayed home with the children and sold illegal drugs. As a result, Davis spent a lot of time with his grandmother. Ms. Davis testified that she and her husband were addicted to drugs and that her husband had been incarcerated several times for drug-related offenses. She testified that Davis's brother was killed in a drug deal several months before the defendant's trial.

Witnesses described Davis as bright, intelligent, and stubborn. He attended private schools until the ninth grade and was a "fast learner." He was a good student and was once listed in "Who's Who Among American High School Students." Davis started having behavior problems, however, was expelled from private school for threatening a teacher, and then transferred to a public school. He dropped out of school in the eleventh grade.

Donald Moore testified that Davis had been selling marijuana and cocaine and that he and Davis smoked marijuana every day. According to Moore, Davis's attitude changed after he left private schools, and he enjoyed the fact that his father was a popular drug dealer. Similarly, Marcus Lattimore, the defendant's cousin, testified that there was drug use in the Davis family and that Davis began selling drugs so that he could get money to obtain a recording studio.

The jury sentenced Davis to death for the premeditated first degree murders of Ewing and Lee after finding that evidence of three aggravating circumstances relied upon by the prosecution outweighed evidence of mitigating circumstances beyond a reasonable doubt. The trial court later imposed concurrent 25-year sentences for the two especially aggravated kidnapping convictions and concurrent 25-year sentences for the two especially aggravated robbery convictions.

The Court of Criminal Appeals affirmed the convictions, the death sentences imposed by the jury, and the sentences imposed by the trial court. Thereafter, the case was automatically docketed in this Court.

**ANALYSIS**

Sufficiency of Evidence

Davis argues that the evidence was insufficient to support the convictions for premeditated first degree murder, especially aggravated kidnapping, and especially aggravated robbery. Davis argues that the evidence was entirely circumstantial, that the testimony of the witnesses conflicted, and that several persons had access to the murder weapons. The State maintains that the evidence was sufficient to support the convictions.

When evaluating the sufficiency of the evidence, we must determine whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). We are required to afford the State the strongest legitimate view of the evidence in the record, as well as all reasonable and legitimate inferences which may be drawn therefrom. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Questions concerning the credibility of the witnesses, the weight to be given the evidence, and any factual issues raised by the evidence are resolved by the trier of fact. Id.; State v. Cazes, 875 S.W.2d 253, 259 (Tenn. 1994).

The offense of first degree murder includes a "premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1) (2003). A premeditated act is "an act done after the exercise of reflection and judgment" and means that "the intent to kill must have been formed prior to the act itself." Tenn. Code Ann. § 39-13-202(d) (2003). An intentional act refers to "the nature of the conduct or to a result of the conduct when it is [a] person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-106(a)(18) (2003).

In State v. Bland, 958 S.W.2d 651 (Tenn. 1997), we discussed circumstances that may warrant the trier of fact to find or infer premeditation. The circumstances include the use of a deadly weapon upon an unarmed victim, the particular cruelty of a killing, any threats or declarations of intent to kill made by the defendant, proof that the defendant procured a weapon, any preparations to conceal the crime undertaken before the crime is committed, and the defendant's calm demeanor immediately after a killing. Id. at 660; see also State v. Keough, 18 S.W.3d 175, 181 (Tenn. 2000).

We conclude that the evidence was sufficient to support Davis's convictions for the first degree murders of Gregory Ewing and D'Angelo Lee. The evidence showed that Davis was involved in a "gun deal" with the victims and had planned to steal the guns and a car. Davis said that the victims would have to be killed because they knew where Davis and the others lived, and he obtained a nine millimeter handgun shortly before the offenses. The evidence also showed that Davis and Gdongalay Berry were seen driving a white Cadillac on the night of the offenses with the victims tied up in the car. Davis and Berry were in possession of assault rifles, handguns, a backpack, Ewing's coat, Lee's tennis shoes, and Davis was wearing a gold necklace that had belonged to Lee. Davis told police that he was present when the victims were shot and killed; Davis told others, however, that he had shot Lee, that he had "unloaded the clip," that he had "drawn down on [Lee]," and that Ewing had begged for his life before being shot by Berry. The evidence showed that Davis and Berry burned the victims' vehicle after the offenses and that Davis tried to conceal the gold necklace he had been wearing at the time of his arrest. Finally, the evidence showed that the victims had been shot with a nine millimeter handgun that was later found in Davis's apartment.

Although the defendant characterizes the evidence as circumstantial, the jury's function was to weigh the credibility of the witnesses and to resolve the conflicts in the testimony. In sum, the evidence overwhelmingly established the offenses of first degree murder.

In addition, we conclude that the evidence, which demonstrated that Davis kidnapped the victims with the use or display of deadly weapons, was sufficient to support Davis's convictions for two counts of especially aggravated kidnapping. See Tenn. Code Ann. § 39-13-305(a) (2003). Similarly, we conclude that the evidence, which demonstrated that Davis intentionally took property belonging to the victims by using a deadly weapon and by causing serious bodily injury, was sufficient to support Davis's convictions for two counts of especially aggravated robbery. See Tenn. Code Ann. § 39-13-403(a) (2003).

<u>Disqualification of District Attorney General</u>

Davis next argues that the trial court erred in denying his motion to disqualify the District Attorney General, Victor S. Johnson, and his entire office based on the District Attorney General's employment of the trial court's former law clerk. He further argues on appeal that the motion should have been granted because the District Attorney General's office had no official screening policies in matters involving conflicts of interest. The State maintains that the trial court did not abuse its discretion in denying the motion.

At a pre-trial hearing, Philip Wehby testified that he had worked as a law clerk for the trial judge, J. Randall Wyatt, and that as the law clerk, he had attended one or two ex parte hearings regarding this case. Wehby testified that he did not work on the case after being hired by the District Attorney General and that he had never discussed the case with anyone in the office. Although Wehby testified that he was unaware of any written policies in the District Attorney General's office regarding conflicts of interest, he stated that it was "understood" that he was to have no involvement

in this prosecution and that he had no knowledge where the case file was kept. The trial court denied the motion to disqualify.[8]

At the time of trial,[9] a prosecutor in a criminal case could be disqualified where there was an actual conflict of interest that prevented the prosecutor from exercising independent judgment free of "compromising interests and loyalties." State v. Culbreath, 30 S.W.3d 309, 312 (Tenn. 2000) (quoting Tenn. R. Sup. Ct. 8, EC 5-1). Even if there was no actual conflict of interest, disqualification could also be based on an appearance of impropriety. Id. at 313; see also Clinard v. Blackburn, 46 S.W.3d 177, 187 (Tenn. 2001) ("'appearance of impropriety is' . . . an independent ground upon which disqualification may be based").

If disqualification of a prosecutor is required, the trial court must determine whether to also disqualify the entire District Attorney General's office. Culbreath, 30 S.W.3d at 313. The trial court's determination requires an inquiry into whether the prosecutor who has the conflict of interest has participated in the ongoing prosecution, including the disclosure of any confidences, and whether the prosecution has established that the prosecutor has been screened from the prosecution. State v. Coulter, 67 S.W.3d 3, 30 (Tenn. Crim. App. 2001); see also Clinard, 46 S.W.3d at 184. The decision is left to the trial court's discretion and will not be reversed on appeal unless the trial court abused its discretion. Culbreath, 30 S.W.3d at 313.

In Clinard, which involved the disqualification of a law firm, this Court held that disqualification was required where an attorney who had represented one party to a lawsuit later accepted employment with the law firm that represented the opposing party in the same lawsuit. Clinard, 46 S.W.3d at 184. We adopted the following framework for determining whether an attorney's prior involvement in a case mandates disqualification of the attorney's new law firm in a subsequent representation: (1) whether a substantial relationship existed between the subject of the former and present representations; (2) whether the presumption of shared confidences has been rebutted with regard to the former representation; and (3) whether the presumption of shared confidences has been rebutted with regard to the present representation. Id.

In applying this analysis in Clinard, we noted that a "substantial relationship" existed because the attorney's involvement in the prior case was so extensive that his employment with his new law firm could be "regarded as a changing of sides." 46 S.W.3d at 184. We emphasized that the attorney's new law firm was an "adversary against the [parties] in the very litigation in which [the attorney] once represented them . . . ." Id. at 188. Although we observed that the presumption of shared confidences was rebutted by "objective and verifiable" evidence of procedures used by the

_____

[8] Although the trial court granted interlocutory review of its decision, the Court of Criminal Appeals declined to grant the interlocutory appeal. Tenn. R. App. P. 9.

[9] At the time of this trial, attorneys in Tennessee were governed by the Code of Professional Responsibility. Effective March 1, 2003, the Code of Professional Responsibility was replaced by the current Tennessee Rules of Professional Conduct. Tenn. R. Sup. Ct. 8, Rules of Professional Conduct. Since the new rules were given prospective application, our decision in this case deals only with the law as it existed at the time of trial.

-10-

new law firm that had "screened" the conflicted attorney from persons, files, or information pertaining to the ongoing case, we also concluded that the procedures did not remove the appearance of impropriety. Id. at 184, 188-89. Accordingly, we held that disqualification of the attorney's new law firm was required. Id. at 189.

Although we have never addressed the precise circumstances presented in this case, the Court of Criminal Appeals has resolved similar cases. In State. v. Tate, 925 S.W.2d 548 (Tenn. Crim. App. 1995), the Court of Criminal Appeals concluded that disqualification was required after a trial judge became the District Attorney General. In Tate, the evidence showed that the trial judge presided over several pretrial rulings in the defendant's case, later became the District Attorney General, and then had four conversations about the case with the assistants who were prosecuting the defendant's case. Id. at 549. In ruling that the District Attorney General's office was disqualified from prosecuting the defendant, the Court of Criminal Appeals emphasized that the District Attorney, when serving as the trial judge, presided over several ex parte hearings during which the defense disclosed confidential matters and that the District Attorney later had lengthy discussions about the case with other prosecutors. Id. at 555-56.

In contrast, in State v. Coulter, 67 S.W.3d 3 (Tenn. Crim. App. 2001), the Court of Criminal Appeals concluded that disqualification of the District Attorney General's office was not required. In Coulter, a defendant's counsel accepted employment with the District Attorney General's office before the defendant's case went to trial. Although counsel had an obvious conflict of interest, the evidence revealed that counsel had no discussions as an assistant district attorney about the defendant's case, had no involvement in the prosecution of the defendant's case, and followed the "screening" procedures the office had implemented to ensure he had no involvement or contact with the case. Id. at 26-27. Accordingly, the Court of Criminal Appeals held that the conflict of interest did not require disqualification of the District Attorney General's office because there had been no disclosure of confidences or participation in the prosecution. Id. at 32.

In our view, application of these decisions and principles establishes that the trial court properly exercised its discretion in refusing to disqualify the District Attorney General's office in the present case. The evidence revealed that Wehby had worked as a law clerk for the trial court and had attended "one, maybe two" ex parte hearings involving the trial judge and defense counsel. The trial court specifically found that his "level of involvement while a law clerk was at most minimal." Indeed, there was no evidence as to what was discussed at the hearings and no showing that Wehby had a substantial relationship to these proceedings.

In addition, after being employed by the District Attorney General, Wehby did not participate in the prosecution of this case, did not have any discussions about the prosecution of this case, and did not share or reveal any information with those who were prosecuting this case. As the trial court noted, Wehby had "not discussed the case with anyone within the office" and had "no access to the case file, which [was] apparently kept separate from the office's other files." Moreover, although Wehby was not aware of a formal screening procedure in the District Attorney General's office, he

testified that it was understood he was to have no contact or involvement with this ongoing prosecution.

The present case is distinguishable from the decisions in Clinard and Tate. For example, in Clinard, the attorney represented and received confidential information from a party to a lawsuit and later began working for the law firm that represented the opposing party in that same lawsuit. Clinard, 46 S.W.3d at 184. We analogized the attorney to a baseball player who has "switched teams in the middle of the game after learning the signals." Id. at 188. Similarly, in Tate, the District Attorney had ruled upon several pretrial, ex parte requests as the trial judge in a case and then later participated in the prosecution of the defendant's case by discussing the case with his assistants. Tate, 925 S.W.2d at 549; see also Lux v. Commonwealth, 484 S.E.2d 145 (Va. Ct. App. 1997).

In contrast, in this case there was no evidence that Philip Wehby had a substantial role as a law clerk for the trial judge in the defendant's case, that he "switched sides" in the defendant's case, that he received confidential information, that he revealed confidential information, or that he participated in the prosecution of Davis. The undisputed evidence is that Wehby was effectively screened from this case after his employment with the District Attorney General and that he had no involvement or communications regarding this case.[10]

Accordingly, we conclude that the trial court did not abuse its discretion in refusing to disqualify the District Attorney General's office in this case.

## Withdrawal of Defense Counsel

Davis argues that the trial court erred in denying a motion to withdraw filed by defense counsel. The State maintains that review of the issue has been waived for failure to preserve the issue in the record on appeal.

The record indicates that Davis's attorneys filed a motion to withdraw prior to trial. At an evidentiary hearing on the motion, defense counsel asserted that they were unable to disclose the basis of their motion due to professional obligations, the attorney-client privilege, and other ethical considerations. The motion to withdraw was transferred to a different trial court, which denied the motion after an ex parte hearing and placed the order and the transcript of the hearing under seal.[11]

---

[10] Although not dispositive in this case, we reiterate the importance for District Attorneys, Public Defenders, law firms, and all other legal agencies to implement effective, written screening procedures to avoid the problems related to conflicts of interests. As we observed in Clinard, such screening mechanisms should consider: the structural organization of the law firm or office, the likelihood of contact between an attorney with a conflict of interest and the personnel involved in the ongoing representation, and the existence of rules that prevent the attorney with the conflict of interest from accessing files or information pertaining to a particular case or from sharing legal fees pertaining to that case. 46 S.W.3d at 184.

[11] Although the trial court granted an interlocutory appeal, the Court of Criminal Appeals denied interlocutory review because defense counsel refused to consent to the unsealing of the trial court's order and the transcript of the
(continued...)

On appeal, the Court of Criminal Appeals held that review of the issue was waived based on defense counsel's refusal to have the trial court's order and transcript unsealed.

In this Court, the position of defense counsel remains the same, i.e., that ethical and professional considerations prevent the unsealing of the trial court's order and the transcript of the ex parte hearing. Moreover, the brief asserts that the issue has been raised for the purpose of preserving it for further review. Under these circumstances, we conclude that the defendant is entitled to no relief on this issue.[12]

## Sufficiency of Indictment

Davis contends that his death sentence is invalid because the indictment failed to charge the aggravating circumstance which distinguishes this capital first degree murder from a non-capital first degree murder. Davis, citing Apprendi v. New Jersey, argues that the Fifth and Sixth Amendments require that aggravating circumstances be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt. Apprendi v. New Jersey, 530 U.S. 466, 476 (2000). Although this issue was not raised in the trial court or in the Court of Criminal Appeals, Davis asserts it amounts to plain error.

We have held Apprendi does not require aggravating circumstances to be alleged in the indictment. State v. Holton, 126 S.W.3d 845, 863 (Tenn. 2004); State v. Dellinger, 79 S.W.3d 458, 467 (Tenn. 2002). Moreover, we have clarified that recent United States Supreme Court rulings in Blakely v. Washington, 524 U.S. ____ (2004), and Ring v. Arizona, 536 U.S. 584, 602 (2002), "do not change our analysis . . . regarding whether aggravating circumstances must be pled in the indictment." State v. Berry, ___ S.W.3d ___ (Tenn. 2004). We explained:

> [T]he primary concern for a defendant charged with first-degree murder is notice that he or she is facing an enhanced sentence of life without parole or death. Such notice is provided for in both the Code and in the Tennessee Rules of Criminal Procedure. Tenn. Code Ann. § 39-13-208 (1996); Tenn. R. Crim. P. 12.3 (1984). Rule 12.3 of the Rules of Criminal Procedure mandates written notice, given at least thirty days prior to trial, of the state's intention to seek the death penalty and of the aggravating circumstances the State intends to rely upon for such enhanced sentence. Section 39-13-208 provides for the

---

[11](...continued)
hearing. See Tenn. R. App. P. 9(c).

[12] Davis has filed a pro se supplemental brief alleging that there is a conflict of interest in that his counsel are intentionally waiving this issue and arguing that the order and transcript must be unsealed. We have recognized, however, that a defendant in a criminal case may not proceed pro se while simultaneously being represented by counsel. See Wallace v. State, 121 S.W.3d 652, 655 n.2 (Tenn. 2003). Accordingly, Davis's contentions cannot be reviewed in this appeal and must await the appropriate proceedings.

same in cases where the State is seeking an enhanced sentence of life without parole.

Id. at ___.

In short, we have rejected Davis's argument, and we have held that the capital sentencing scheme in Tennessee does not require that aggravating circumstances be included in an indictment. The issue is without merit.

Prior Violent Felony Aggravating Circumstance

Davis argues that the trial court erred in allowing the prosecution to rely on his prior conviction for first degree murder in establishing the "prior violent felony" aggravating circumstance pursuant to Tennessee Code Annotated section 39-13-204 (i)(2) (2003) because he was a juvenile when the prior offense was committed. Davis argues that because a juvenile is not eligible for the death penalty, the prior offense should not be used to impose the death penalty for a later offense. The State maintains that the prior conviction for first degree murder was properly applied.

We begin our review with the language of Tennessee Code Annotated section 39-13-204(i)(2) (2003), which states: "The defendant was previously convicted of one (1) or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person[.]" The plain language requires the prosecution to prove that the defendant had (1) a prior conviction, (2) for a felony offense, (3) whose statutory elements involved the use of violence to a person. The statutory language has no other required elements or restrictions. Moreover, there is simply no indication that a prior conviction that meets these statutory elements must also have been committed by a defendant on or after the age of 18.

We next examine the statutory provisions that allow a juvenile offender to be transferred to criminal court for trial as an adult where:

> The child was sixteen (16) years or more of age at the time of the alleged conduct, or the child was less than sixteen (16) years of age if such child was charged with the offense of first degree murder, second degree murder, rape, aggravated rape, aggravated robbery, especially aggravated robbery, kidnapping, aggravated kidnapping or especially aggravated kidnapping or an attempt to commit any such offenses. The district attorney general may not seek, nor may any child transferred under the provisions of this section receive, a sentence of death for the offense for which the child was transferred[.]

Tenn. Code Ann. § 37-1-134(a)(1) (2001) (emphasis added). Although the statute plainly states that an offender may not receive the death penalty "for the offense for which the child was transferred,"

-14-

there is no statutory language prohibiting the use of a conviction for that offense to enhance the punishment for a conviction of a *later* offense. Indeed, had the legislature intended for such a restriction or limitation, it could have included the appropriate statutory language.

We also believe that the plain meaning of the above statutes is consistent with the overall capital sentencing structure in Tennessee. A capital sentencing scheme must allow for an individualized sentencing determination based on "the character of the individual and the circumstances of the crime." State v. Middlebrooks, 840 S.W.2d 317, 343 (Tenn. 1991). A defendant is entitled to present relevant evidence in mitigation of sentence, see Skipper v. South Carolina, 476 U.S. 1, 4 (1986), and the prosecution is entitled to present relevant evidence in aggravation, "as long as it is relevant to the sentencing decision and promotes the reliability of that determination," Middlebrooks, 840 S.W.2d at 343. In addition, we have explained:

> As a constitutionally necessary first step under the Eighth Amendment, the Supreme Court has required the states to narrow the sentencers' consideration of the death penalty to a smaller, more culpable class of homicide defendants . . . . A proper narrowing device . . . provides a principled way to distinguish the case in which the death penalty was imposed from the many cases in which it was not . . ., and must differentiate a death penalty case in an objective, even-handed, and substantially rational way from the many murder cases in which the death penalty may not be imposed. . . . As a result, a proper narrowing device insures that, even though some defendants who fall within the restricted class of death-eligible defendants manage to avoid the death penalty, those who receive it will be among the worst murderers – those whose crimes are particularly serious, or for which the death penalty is peculiarly appropriate.

Id. (citations omitted).

In our view, the "prior violent felony" aggravating circumstance in this case achieved the required "narrowing" purpose. Indeed, Davis's conviction for a prior first degree murder, for which he was tried as an adult, provided a principled, rational way in which to differentiate this case from other cases and was properly weighed by the jury in analyzing the evidence of aggravating and mitigating circumstances and in determining the appropriate punishment. In short, there was no constitutional or statutory restriction against the use of Davis's prior conviction for first degree murder in this case.

-15-

## Sufficiency of Aggravating Circumstances

We next undertake our mandatory review of whether the evidence supported the jury's finding that the aggravating circumstances were established beyond a reasonable doubt and that the aggravating circumstances outweighed evidence of mitigating circumstances beyond a reasonable doubt. Tenn. Code Ann. § 39-13-206(c)(1)(B)-(C) (2003).

The record reveals that the jury found that three aggravating circumstances had been proven beyond a reasonable doubt: the defendant was previously convicted of one or more felonies whose statutory elements involved the use of violence to the person; the murders were committed for the purpose of avoiding, interfering with, or preventing a lawful arrest of the defendant; and the murders were knowingly committed, solicited, directed, or aided by the defendant while the defendant had a substantial role in committing or attempting to commit a robbery or kidnapping, and that these aggravating circumstances outweighed evidence of mitigating circumstances beyond a reasonable doubt. Tenn. Code Ann. §§ 39-13-204(i)(2), (6), (7) & 39-13-206(c)(1)(B)-(C) (2003).

### A.  Prior Violent Felonies

Davis argues that the evidence was insufficient to support the "prior violent felony" aggravating circumstance because the prosecution relied on an offense – first degree murder – that was committed as a juvenile. As discussed above, this issue is without merit. Moreover, Davis makes no allegations with regard to the sufficiency of his prior conviction for attempted second degree murder, which was also relied upon by the prosecution.

### B.  Avoiding, Interfering With or Preventing Lawful Arrest

Davis also argues that the evidence was insufficient to establish that the murders were committed for the purpose of avoiding, interfering with, or preventing a lawful arrest. Tenn. Code Ann. § 39-13-204(i)(6) (2003).

Tennessee Code Annotated section 39-13-204(i)(6) (2003) may apply where a "murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another." This aggravating circumstance focuses on the defendant's motives for committing a murder and is not limited to the killings of eyewitnesses or those witnesses who know or can identify the defendant. Terry v. State, 46 S.W.3d 147, 162 (Tenn. 2001); see also State v. Hall, 976 S.W.2d 121, 133 (Tenn. 1998). Moreover, the defendant's desire to avoid arrest or prosecution need not be the sole motive for killing the victim and instead may be just one of the purposes motivating the defendant to kill. Terry, 46 S.W.3d at 162.

In this case, the record reveals that Davis told others that a fake "gun deal" was set up in order to steal guns and a car from the victims, Ewing and Lee. Antonio Cartwright heard Davis say that the victims would have to be killed "because they knew who they was and they knew where they

stay." Moreover, the record reveals that the two victims were tied up in the car while Davis and Berry unloaded the stolen guns and the victims were later shot multiple times and left in a construction site. In sum, the evidence was sufficient to support this aggravating circumstance beyond a reasonable doubt.

## C. Felony Murder

Davis next argues that the evidence was insufficient to support the "felony murder" aggravating circumstance because it may not be applied to convictions for felony murder. Tenn. Code Ann. § 39-13-204(i)(7) (2003).

Tennessee Code Annotated section 39-13-204(i)(7) (2003) may be applied where:

> The murder was knowingly committed, solicited, directed, or aided by the defendant, while the defendant had a substantial role in committing or attempting to commit, or was fleeing after having a substantial role in committing or attempting to commit, any first degree murder, arson, rape, robbery, burglary, theft, kidnapping, aircraft piracy, or unlawful throwing, placing or discharging of a destructive device or bomb.

Although this aggravating circumstance may not be applied where it duplicates the felony that serves as the predicate for a felony murder conviction, see Middlebrooks, 840 S.W.2d at 341, it may be applied to convictions for premeditated first degree murder, see State v. Davidson, 121 S.W.3d 600, 609 n.4 (Tenn. 2003).

Here, the record reveals that Davis was convicted of the premeditated first degree murders of Ewing and Lee and that Davis's convictions for felony murder were merged into these convictions. Moreover, the premeditated first degree murders were committed in the perpetration of the robbery and kidnapping of the victims. The evidence, therefore, was sufficient to support this aggravating circumstance beyond a reasonable doubt.

## D. Weighing of Mitigating Evidence

Finally, Davis contends that the evidence of these aggravating circumstances did not outweigh evidence of mitigating circumstances beyond a reasonable doubt.

The overwhelming evidence of the three aggravating circumstances outlined above was countered with primarily background mitigation evidence. Davis was 18 years of age at the time of the murders. Several witnesses testified that his parents were drug addicts and that his father had been incarcerated for drug-related offenses. The evidence also reflected that Davis had performed well in private schools before he started selling drugs and thereafter became a disciplinary problem. The defense presented little or no evidence regarding the circumstances of the offenses or mitigating

the defendant's involvement. In sum, the evidence supported the jury's finding that the evidence of the three aggravating circumstances outweighed mitigating circumstances beyond a reasonable doubt.

Proportionality

Where a defendant has been sentenced to death, we must apply a comparative proportionality analysis pursuant to Tenn. Code Ann. § 39-13-206(c)(1)(D) (2003). The analysis is intended to identify aberrant, arbitrary, or capricious sentencing by determining whether the death sentence is "disproportionate to the punishment imposed on others convicted of the same crime." Bland, 958 S.W.2d at 662 (quoting Pulley v. Harris, 465 U.S. 37, 42-43 (1984)).

In conducting this analysis, this Court employs the precedent-seeking method of comparative proportionality review, in which we compare a case with cases involving similar defendants and similar crimes. Bland, 958 S.W.2d at 665-67. While no defendants or crimes are precisely alike, a death sentence is disproportionate if a case is "plainly lacking in circumstances consistent with those in cases where the death penalty has been imposed." Id. at 668.

We have repeatedly held that the pool of cases considered by this Court in its proportionality review includes those first degree murder cases in which the State seeks the death penalty, a capital sentencing hearing is held, and the sentencing jury determines whether the sentence should be life imprisonment, life imprisonment without the possibility of parole, or death. State v. Godsey, 60 S.W.3d 759, 783 (Tenn. 2001). We have explained that the pool does not include first degree murder cases in which a plea bargain is reached with respect to the punishment or in which the State does not seek the death penalty:

> [C]onsideration of cases in which the State, for whatever reasons, did not seek the death penalty would necessarily require us to scrutinize what is ultimately a discretionary prosecutorial decision. . . . We previously have declined to review the exercise of prosecutorial discretion . . . , and it would be particularly inappropriate to do so in conducting comparative proportionality review, where our function is limited to identifying aberrant death sentences, not identifying *potential* capital cases.

Id. at 784 (citations omitted).

Accordingly, our comparative proportionality review of the applicable pool of cases considers numerous factors regarding the offense: (1) the means of death; (2) the manner of death; (3) the motivation for the killing; (4) the place of death; (5) the victim's age, physical condition, and psychological condition; (6) the absence or presence of premeditation; (7) the absence or presence of provocation; (8) the absence or presence of justification; and (9) the injury to and effect upon non-decedent victims. We also consider numerous factors about the defendant: (1) prior criminal record,

if any; (2) age, race, and gender; (3) mental, emotional, and physical condition; (4) role in the murder; (5) cooperation with authorities; (6) level of remorse; (7) knowledge of the victim's helplessness; and (8) potential for rehabilitation. Bland, 958 S.W.2d at 667; see also State v. Bane, 57 S.W.3d 411, 428-29 (Tenn. 2001).

The particular circumstances of this case demonstrate that the defendant, Christopher Davis, arranged a meeting with the victims, Gregory Ewing and D'Angelo Lee, under the guise of buying guns. Prior to the meeting, Davis borrowed a nine millimeter handgun; then, along with Gdongalay Berry, Davis robbed the victims, tied them up, and transported them in the victims' car to Davis's apartment. After assault rifles, handguns, and other items were taken into Davis's apartment, the victims were taken to a remote construction site in the Berry Hill area of Nashville and were shot numerous times in the head with a nine millimeter handgun and a .45 caliber handgun. Davis told Antonio Cartwright that he had shot Lee nine times in the head and that the victims' bodies had been dumped where they would not be found. Davis also told Christopher Loyal that he had gone to get some guns from the victims, that one of the victims was crying and begging for his life, and that he "unloaded the clip." Bullets found in the victims matched a nine millimeter handgun recovered in Davis's apartment. Davis was seen wearing a gold necklace that had belonged to one of the victims, and he tried to get rid of the necklace following his arrest.

Davis was 18 years old at the time of the offenses. He had prior convictions for two violent felonies, including one for first degree murder. He played a major role in planning and executing the robbery, kidnapping, and killing of Ewing and Lee. Davis offered no cooperation with law enforcement; instead, he fled from officers before his arrest, tried to conceal evidence that had belonged to the victims, and gave inconsistent statements to investigating officers. Davis showed no remorse for the offenses or for the death of the victims, and he told others that one of the victims had been shot after begging for his life.

Davis offered mitigating evidence regarding his family background and the fact that his mother and father were drug addicts. Davis's father had been imprisoned for drug-related offenses, and Davis himself used and sold drugs. There was no evidence that Davis had physical, mental, or emotional difficulties that impaired his judgment or had any relevance to the offenses. Although Davis had been a promising student at one time, there was no evidence of Davis's potential for rehabilitation.

This Court has frequently upheld the death penalty in first degree murder cases involving shooting offenses committed in the course of a robbery or other felony. For example, in State v. Reid, the defendant received the death penalty for shooting two robbery victims. 91 S.W.3d 247, 260 (Tenn. 2002). Similarly, in State v. Stout, the defendant received the death penalty for kidnapping the victim and shooting her in the head. 46 S.W.3d 689, 693-94 (Tenn. 2001). In State v. Sims, the defendant received a death sentence for shooting the victim in the course of burglarizing the victim's home. 45 S.W.3d 1, 5-6 (Tenn. 2001). Likewise, in State v. Hall, the defendant received a death sentence after he and others killed two victims by shooting and stabbing them and then stealing the victims' car. 976 S.W.2d 121, 128-29 (Tenn. 1998); see also State v. Henderson,

24 S.W.3d 307, 310 (Tenn. 2000) (defendant shot a deputy sheriff in the back of the head at close range); State v. Cribbs, 967 S.W.2d 773, 777 (Tenn. 1998) (defendant shot victim in the head during a robbery).

In addition, this Court has often upheld death sentences in cases that involved the three aggravating circumstances applied in this case, i.e., the defendant's previous convictions for one or more felonies whose statutory elements involved the use of violence to the person; the murders were committed for the purpose of avoiding, interfering with, or preventing a lawful arrest of the defendant; and the murders were knowingly committed, solicited, directed, or aided by the defendant while the defendant had a substantial role in committing or attempting to commit a robbery or kidnapping. Reid, 91 S.W.3d at 287; Sims, 45 S.W.3d at 19-20; Hall, 976 S.W.2d at 138; State v. Bates, 804 S.W.2d 868, 882-83 (Tenn. 1991). Moreover, the "prior violent felony" aggravating circumstance applicable in these and numerous other death penalty cases is "more qualitatively persuasive and objectively reliable than other[]" aggravating circumstances. State v. Howell, 868 S.W.2d 238, 262 (Tenn. 1993).

Finally, this Court has upheld the death sentence in several cases involving young defendants or substantially similar mitigating evidence. For example, several cases have involved defendants who were the same or similar age as Davis. State v. Pike, 978 S.W.2d 904, 922 (Tenn. 1998); Bland, 958 S.W.2d at 674 n.26; State v. Bush, 942 S.W.2d 489, 494 (Tenn. 1997). Likewise, numerous cases have involved defendants who relied on mitigating evidence of their family backgrounds, poor childhood environments, drug usage, and other related issues. Stout, 46 S.W.3d at 708; Henderson, 24 S.W.3d at 318; Pike, 978 S.W.2d at 922; Bland, 958 S.W.2d at 670.

We reiterate that our task does not require a finding that this case is exactly like a prior case in every respect, nor does it require a determination that this case is "more or less" like other similar death penalty cases. See State v. McKinney, 74 S.W.3d 291, 313 (Tenn. 2002). Instead, we must identify aberrant death sentences by determining whether a case plainly lacks circumstances similar to those cases in the relevant pool of cases[13] in which a death sentence has been upheld. Id. Accordingly, for the foregoing reasons, the death sentences imposed on Davis for these offenses are not arbitrary or disproportionate.

**CONCLUSION**

After reviewing the record and applicable authority, we hold as follows: (1) the evidence was sufficient to support the jury's verdicts; (2) the trial court did not err in refusing to disqualify the District Attorney General; (3) the trial court did not err in refusing to allow defense counsel to withdraw; (4) the death sentences were not invalid on the ground that the aggravating circumstances were not set out in the indictment; (5) the trial court did not err in allowing the prosecution to rely on an offense committed when the defendant was a juvenile in establishing the prior violent felony

---

[13] Accordingly, Davis's reliance on two unpublished decisions that did not involve capital sentencing hearings is misplaced.

aggravating circumstance; (6) the evidence was sufficient to support the jury's finding of three aggravating circumstances and its determination that the aggravating circumstances outweighed the evidence of mitigating circumstances beyond a reasonable doubt; and (7) the death sentences were not arbitrary or disproportionate. We also agree with and affirm the Court of Criminal Appeals' analysis and conclusions with respect to the remaining issues, the relevant portions of which are included in the appendix to this opinion.

The defendant's sentence of death is affirmed and shall be carried out on the 15th day of March, 2005, unless otherwise ordered by this Court or other proper authority. It appearing that the defendant is indigent, costs of the appeal are taxed to the State.

_____
E. RILEY ANDERSON, JUSTICE