IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs November 14, 2019

## DOUGLAS W. CURTIS v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Lewis County**
**No. 2017-CR-32, 2012-CR-6      James G. Martin, III, Judge**

_____

### No. M2018-01712-CCA-R3-PC
_____

The petitioner, Douglas W. Curtis, appeals the denial of his post-conviction petition, arguing the post-conviction court erred in finding he received effective assistance of counsel at trial and on appeal. After our review of the record, briefs, and applicable law, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which ALAN E. GLENN, J. joined. NORMA MCGEE OGLE, J., concurring in results only.

Douglas W. Curtis, Mountain City, Tennessee, Pro Se.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Assistant Attorney General; Kim R. Helper, District Attorney General; and Jennifer Mason, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### *Facts and Procedural History*

On direct appeal, this Court summarized the facts surrounding the petitioner's convictions for four counts of rape of a child, as follows:

> This case arose after the victim, who was twenty-nine years old at the time of trial, came forward with allegations that the [petitioner], her father, raped her when she was a young girl. The victim testified that she was born December 27, 1985.

The State's evidence came primarily from the testimony of the victim and a recorded telephone call. In the summer of 2011, the victim was living with the [petitioner], her brother, and her sister. At that point in time, she had been attending a church for almost a year and had developed a close relationship with the pastor's wife, Debbie Landers. During the summer, the victim witnessed an event that caused her to have concern for another individual. She asked Ms. Landers for advice, and Ms. Landers testified that she told the victim that the victim had to report the incident. Ms. Landers recommended that the victim contact the Department of Children's Services ("DCS"), the sheriff's department, or the city police. The victim contacted DCS and the Child Advocacy Center ("CAC"), and the CAC directed her to Investigator Johnny Hilburn of the Lewis County Sheriff's Department. She went to speak with Investigator Hilburn about the incident, and he testified that based on his conversation with the victim, he began to believe that she was a victim of abuse herself. Investigator Hilburn asked the victim if there was anything in her past that she wished to discuss, and she stated that she was touched by her father. The victim testified that prior to speaking with Investigator Hilburn, she had not contacted law enforcement regarding the [petitioner].

The victim testified about four instances of sexual abuse that the [petitioner] committed against her. The first incident happened on February 14, 1998, when she was twelve years old. At that time, the victim and the [petitioner] had "a very close relationship." The [petitioner] allowed her to stay up late to watch television with him while her siblings had to go to bed, and she received privileges and gifts that her siblings did not. On Valentine's Day, the [petitioner] gave the victim a bear, and she stayed up late to watch television and "hang out with" the [petitioner]. Her mother, brother, and sister were each asleep in their bedrooms. The victim testified that the [petitioner] went into his office and laid down a blanket. He returned to the victim and asked her if she "wanted to mess around." The victim "shrugged [her] shoulders," and the [petitioner] took her by the hand and led her to the office. She lay down, and the [petitioner] began to touch her body. She testified that the [petitioner] rubbed his fingers across her vagina and digitally penetrated her vagina. Once he was finished, he picked up the blanket and went to bed. The victim testified that she went with the [petitioner] to the office because she loved him and "felt special" and "wanted to do what he said."

The victim testified that a second, similar incident also occurred in 1998, when she was twelve years old. She recalled that she had finished

the sixth grade and had recently made the cheerleading squad. She was staying up late with the [petitioner], and he congratulated her on making the cheerleading squad. The [petitioner] then "disappeared and went into the office and laid down a blanket, came back and asked [her] if [she] wanted to mess around." She shrugged her shoulders and went with him to the office. She lay down, and the [petitioner] touched her body. He touched her chest and then touched the outside of her vagina, eventually digitally penetrating her vagina.

A third incident occurred in July of 1998 when the [petitioner] made her perform oral sex on him. The victim distinguished this incident from the previous two incidents because she recalled that it occurred on the [petitioner's] birthday. The [petitioner] and the victim were staying up late watching television when the [petitioner] "disappeared to put the blanket down in the office." He returned and asked the victim if she "wanted to mess around." She shrugged her shoulders and went with him to the office. She testified that the [petitioner] was wearing a bathrobe, and "he pulled it apart at the bottom and asked if he got something special." He sat the victim down beside him and "caressed [her] back and hair area." The [petitioner] placed his hand on the victim's head, directing her head toward his penis. The victim placed her mouth on the [petitioner's] penis, and he "guided [her] head up and down." The [petitioner] then lifted the victim's head up and ejaculated onto his stomach. The [petitioner] cleaned up the ejaculate with a blanket that was on the floor, and he placed the blanket in the washroom. The victim recalled that the [petitioner] told her that "he wanted to be the one to show [her] the right way to do these things, he wanted to be the one to show [her] how to treat a man." On cross-examination, the victim stated that this incident occurred in her bedroom on her futon.

The fourth incident occurred on a date between February 7, 1997, and December 26, 1998. The victim testified that during these dates, the [petitioner] drove a church bus that would pick up the elderly and children and take them to church on Wednesday nights. One Wednesday night, the victim accompanied the [petitioner]. After they had dropped off the parishioners and were alone in the van, the [petitioner] asked the victim if she wanted to mess around. He used his hand to direct the victim to his penis, and she put her mouth on his penis. After this incident, the victim told the [petitioner] that she did not want to do these things any longer because it made her "feel disgusting."

During the summer between the victim's eighth and ninth grade years, the victim's parents separated, and the [petitioner] moved to Florida. Each child went to visit him separately, and the victim went first. Eventually, the victim, her mother, brother, and sister all moved to Florida, but the [petitioner] and his wife could not reconcile. The family moved back to Tennessee, and the [petitioner] and the victim's mother divorced when the victim was in the tenth grade. The victim's mother, brother, and sister moved to Tullahoma, Tennessee. The victim lived with the [petitioner] in Hohenwald, Tennessee, and she testified that she did so voluntarily. The victim continued to have a relationship with the [petitioner] during her high school and college years, and she described the relationship as "a very husband and wife kind of relationship." She testified that she continued to visit and live with the [petitioner] in college because she "loved him and he was [her] dad." She testified that she loved the [petitioner] at the time and cared about him. She explained that she waited so long to disclose the abuse because she could "forgive and forget," but seeing someone else suffering abuse prompted her to contact authorities.

After disclosing the abuse to Investigator Hilburn, the victim participated in a "perp phone call" with the [petitioner], which was a controlled telephone call that Investigator Hilburn recorded. The victim testified that she was reluctant to make the phone call because she did not "want to betray" the [petitioner]. Investigator Hilburn directed the victim to ask the [petitioner] about allegations of sexual abuse against a second child, and he scripted several questions for the victim to ask the [petitioner]. One particular question was what made the [petitioner] "sexually attract[ed] to an eight-year-old." The recorded phone call was played for the jury, and we have included the relevant portions of that conversation:

> Victim: [A child][1] said that you touch her, like you did when I was a kid, like touch her.
>
> [The p]etitioner: No, that's bullcrap.
>
> . . .

---

[1] The [petitioner's] strategy at trial was to attempt to question the authenticity of the recording, and as a result, the [petitioner] chose to allow the references to a second victim. The State presented expert testimony that the recording was authentic and had not been edited.

- 4 -

[The p]etitioner: I have never touched that child except to give her a bath. . . .

Victim: I cannot believe that.  I cannot believe it.  I'm sorry.

. . .

[The p]etitioner: I promise you that's not going on.  You just don't know how many times I want to kill myself over the other deal already.  And it's not going to happen again.

. . .

Victim: Can I ask you why you did it to me?

[The p]etitioner: Well you know why.

Victim: No, I don't.

. . .

Victim: After all these years, I still don't know.  I need that closure.

[The p]etitioner: Well like I said, I know, I know the damage that was done there, I, you know, I never will forgive myself for that.  You know, you just don't know.

Victim: I don't think you know the damage that was truly done.  How I grew up just hating you so much. . . .  I've truly forgiven you inside, but it's so hard to forget.

[The p]etitioner: I know that.  And if there is anything I could do to change it, I would.  But as far as [the child], there's nothing like that going on and there never will be.

. . .

Victim: I really need to know . . . why.  Honestly . . . what makes you think it's okay to do that though?  To have sex with a little girl?  A twelve-year-old girl. .

[The p]etitioner: It wasn't right.

Victim: Then why did you do it, Daddy?

[The p]etitioner: I have no answer for that other than I loved you and I'm [unintelligible] stupid. And I still love you to death, you know that.

. . .

Victim: So you thought it was okay to show your love like that?

[The p]etitioner: In a way, at the time I did. And of course I have regrets about it. I've told you. And if there was anything I could do to turn back time, it never would have happened.

. . .

[The p]etitioner: I've told you before, you know, unfortunately, you're the only person that I ever even crossed the line, and I don't know why. Like I said, I love you, and I just made a stupid, stupid, stupid mistake, you know? But, I don't know, that's why when -- I know when you came back to live at home you was worried about that too, and that's why I've not even, you know, tried to make you act or see things any different than a father-daughter relationship, and that's maybe, I guess it's too late for that now. But that's--I wish, in my heart, that's what I want, you know?

Victim: . . . I can never have that love that I wanted for a father, and it hurts my heart so bad.

[The p]etitioner: I wish you had told me way back then, you know?

Victim: I did! Do you not remember me telling you, I wanted stop because I felt gross? And you just wouldn't. You

didn't. You cried, and it made me feel bad for wanting to stop.

[The p]etitioner: Well, just that one time you did, yeah. And then, after that, you never said nothing else to me. When we moved back here and everything, you never said a word to me. I guess in my unreality of the whole thing, I thought you were happy too.

Victim: What, what -- I want to know one more thing. At eight years old, okay, what, just let me, I don't know what made you attracted to me at eight years old, like, I don't know.

[The p]etitioner: You weren't eight.

Victim: How old was I?

[The p]etitioner: Like I said about twelve. Eleven, twelve.

. . .

[The p]etitioner: To me, what we had in my stupidity and idiotic self was special, you know? I -- I never touched your brother or your sister, and it's not like I'm just a pervert running around, you know, molesting kids or whatever. You know what I'm saying? It's just not that way. And I'm sorry that -- that it happened to you, and I don't know what else to say to you. I tried to make up for it any way I can, but I know I can't, and I try to make the best of a bad situation, if that makes any sense. I try and make you feel as comfortable as possible, you know. Because I -- I do know, because I -- you don't know what I've been through either. It's a two-way thing there. I'm sure it's worse on you, but it's still -- it's bad on me too.

Victim: Alright.

[The p]etitioner: And I was hoping you did forgive me, and the way you've been acting, you did forgive me. And I was just hoping that it was a mistake that was gonna go away.

That you could see me as your dad and nothing more, and just really be your daddy, you know.

Victim: I've never looked at you and not seen that person. Not once have I ever looked at you and thought, this is my sweet Dad that I love so much. Not one time, Dad.

[The p]etitioner: Well, I don't know what to say about that either. I deserve it.

Victim: Alright.

[The p]etitioner: But I wish you would forgive me. . . .

Victim: Alright.

. . .

[The p]etitioner: And I really am--I really am sorry . . . . You just don't know how sorry I am and how much hurt I've been through as well, and it all revolves around did I hurt you. I'm--I know, you know, you may not think I know, but I know.

Shortly after the phone call, Investigator Hilburn briefly met with the [petitioner]. The next day, he interviewed the [petitioner] and informed him that the victim had made allegations against him. The [petitioner] told Investigator Hilburn that the victim was upset with him and likely retaliating over a situation that occurred a week prior to the interview. Investigator Hilburn asked the [petitioner] if he had received a phone call from the victim the previous day. The [petitioner] replied that he received numerous phone calls from the victim, and Investigator Hilburn asked him if he remembered a particular conversation and how he would respond if he knew that conversation was recorded. The [petitioner] answered that he did not know what conversation Investigator Hilburn was referring to, and he denied that he was the person on the recording after Investigator Hilburn played him portions of the call. Investigator Hilburn received permission to examine the [petitioner's] cell phone, and he saw that there was a call from the victim's phone number that matched the time and duration of the recording. The [petitioner] responded that he did not receive a phone call from the victim or speak to her at that time. Investigator Hilburn testified

that he had interacted with the [petitioner] prior to the phone call and was familiar with the [petitioner's] voice. He said that the voice on the recording appeared to be the [petitioner's] voice.

Investigator Hilburn agreed that his employment with the Lewis County Sheriff's Department was terminated after the conclusion of the investigation into the [petitioner] for reasons unrelated to the investigation. He agreed that there were no references in his notes to the dates that the victim said the abuse occurred.

The victim testified that she paid her college tuition with college loans, and she used her uncle to co-sign one loan application. She testified that she received permission from her aunt to use her uncle as a co-signer, but she stated that she had not personally received permission from him to do so. She later learned that her uncle did not know about the loan and had not given her permission to use his name. She testified that she had not asked the [petitioner] for money to help pay off the loan shortly before making the accusations against him. She also testified that after graduating from college, she worked for a mental health facility as a caseworker, and she was fired for violating company policy.

The jury convicted the [petitioner] of four counts of rape of a child as charged. The trial court denied his motion for new trial, and he filed a timely notice of appeal.

*State v. Douglas Curtis*, No. M2015-01372-CCA-R3-CD, 2016 WL 7654946, at *1-5 (Tenn. Crim. App. Aug. 26, 2016), *no perm app. filed*.

Following the denial of his direct appeal, the petitioner filed a timely pro se petition for post-conviction relief, asserting a myriad of claims against trial counsel, appellate counsel, the trial court, and the State. After the appointment of counsel, the petitioner filed two amended petitions for post-conviction relief, arguing trial counsel was ineffective for failing to introduce expert testimony, establish an alibi, review the bill of particulars with the petitioner, and adequately advise the petitioner regarding a plea offer, and for stipulating to the authenticity of the recording. The petitioner also argued appellate counsel was ineffective for failing to raise "the aforementioned issues" on direct appeal.

At the post-conviction hearing, the petitioner testified he hired trial counsel prior to his arrest based on good "word of mouth." The petitioner and trial counsel met three times, twice in trial counsel's office and once in jail following the petitioner's arrest on

methamphetamine charges. Although trial counsel did not review discovery or discuss trial strategy, the petitioner believed the State's evidence would consist of the testimony of the victim and a recording of an alleged phone conversation between the victim and the petitioner.

The petitioner denied seeing the indictment or bill of particulars in his case, and, if he had known the dates of the alleged rapes, he would have provided trial counsel with information supporting his alibi. Specifically, the petitioner testified the home office where two of the rapes occurred did not exist during the year the victim alleged, and, although the victim testified she was raped on the petitioner's birthday in 1998, the family was camping in California on that date. The victim also alleged she was raped on Valentine's Day in 1998. However, the petitioner testified he and his wife "made a big deal" of the holiday and "had a very intimate evening" together. Additionally, the petitioner could not have raped the victim in the church van on a Wednesday night because he used his own vehicle to drive to the nursing home on Thursday nights and only drove the church van on Sunday mornings. The petitioner testified he told trial counsel about the home office, but trial counsel refused to introduce the petitioner's alibi at trial because the petitioner did not have any evidence to support his claim.

Regarding the recording, the petitioner believed the victim secretly recorded conversations with him and used the skills she learned in her college audio engineering classes to splice together pieces of the recorded conversations with questions about child rape. The petitioner testified he hired Mitch Davis, a private investigator in Nashville, to perform an analysis of the recording. Mr. Davis confirmed the voice on the recording was the petitioner's but found inconsistencies in the recording he was not qualified to analyze. Mr. Davis recommended the petitioner hire Tom Owen to perform further analysis into the recording's authenticity.

The petitioner paid Mr. Owen $9,500 to perform a forensic analysis of the recording which revealed multiple anomalies and caused Mr. Owen to question its authenticity. Unbeknownst to the petitioner, a second version of the recording, which was taken directly from the server at the Lewis County Sheriff's Department, was later sent to Mr. Owen for analysis because the first recording was not "in wave form." Mr. Owen analyzed this second recording and again found evidence of tampering. At a pre-trial hearing, Mr. Owen testified the anomalies in the second recording were caused by (1) someone manually pausing the recorder and (2) poor cell phone reception. Although Mr. Owen testified the recording was not made by splicing together separate conversations, he was not aware the victim had taken audio engineering classes, and the petitioner believed this knowledge may have changed Mr. Owen's opinion. On cross-examination, the petitioner conceded phone records showed he received a call from the victim's cell phone on the day of the recording and the duration of the call approximately

matched the duration of the recording. However, the petitioner testified he did not have his cell phone in his possession on that day.

The petitioner believed Mr. Owen was going to testify on his behalf at trial because his findings "vindicated" the petitioner. However, a few weeks prior to trial, the petitioner received a letter from trial counsel stating Mr. Owen demanded $17,000 to analyze the original recorder and to replace travel expenses that were lost when the trial was continued. Because the petitioner was unable to pay the additional funds, the trial court declared the petitioner indigent, and trial counsel orally requested a continuance to allow Mr. Owen time to analyze the recorder and $17,000 to pay for the analysis and travel expenses. Although the trial court directed trial counsel to make these requests in writing, trial counsel failed to do so. Mr. Owen did not testify at the petitioner's trial, and trial counsel never explained his concerns regarding Mr. Owen's potential testimony. On cross-examination, the petitioner acknowledged trial counsel was able to argue the recording was manipulated without Mr. Owen's testimony.

Prior to the petitioner's trial, the State presented a plea offer of ten years at 100 percent which would resolve all charges related to both the victim and the victim's younger sister[1]. Because the petitioner believed trial counsel was going to obtain a continuance to allow Mr. Owen to analyze the recorder, the petitioner rejected the offer. Trial counsel then forced the petitioner to sign a statement acknowledging he was rejecting the offer because he "would rather go to trial and face the rest of [his] life in prison." Although the petitioner initially refused to sign the paper, the trial court later ordered him to sign it. However, if the petitioner had known trial counsel was not going to allow Mr. Owen to testify, the petitioner would have accepted the plea offer. Additionally, during the trial, when the petitioner learned Mr. Owen was not going to testify, he advised trial counsel he wanted to accept the plea offer but was told it was "too late."

During the victim's trial testimony, the petitioner wanted trial counsel to question the victim about her experience and education in audio and video engineering. The petitioner believed these questions were essential to prove the recording was not authentic. The petitioner also wanted trial counsel to question the victim about student loan documents and time sheets she had forged. However, trial counsel chose to attack the victim's credibility by asking her about a television show she testified was on prior to one of the rapes. Trial counsel also introduced evidence proving the show aired in the early evening and was not on at 10:30 p.m. as the victim had alleged. The petitioner

---

[1] The victim's younger sister was the second victim referenced during the petitioner's trial and on the recording.

testified trial counsel did not look into the victim's background, and, if he had, trial counsel would have discovered two arrests for theft.

During cross-examination, the petitioner acknowledged the victim was asked about her education, and she stated her degree was in university studies with a concentration in recording industry and speech and theater. However, the petitioner testified the victim changed her major prior to his trial so she could testify she was not an audio engineer. The petitioner also conceded the victim was asked about the forged loan documents and time sheets, but insisted her answers were misleading because she did not disclose the details surrounding these incidents.

When asked about the issues appellate counsel failed to include in his direct appeal, the petitioner testified appellate counsel should have appealed the trial court's decision to allow the jury to hear about the allegations against the petitioner's younger daughter. Although the petitioner asked appellate counsel to include this issue in the motion for new trial and direct appeal, appellate counsel failed to do so. However, the petitioner was able to orally raise the issue during the motion for new trial hearing. Additionally, the petitioner believed appellate counsel should have appealed the trial court's failure to conduct a proper *Daubert*[2] hearing to test the State's expert's qualifications and methods. Following the denial of his direct appeal, appellate counsel did not inform the petitioner of the possibility of filing a Rule 11 application with the supreme court.

On cross-examination, the petitioner agreed the strategy at trial was to attack the authenticity of the recording. He also agreed trial counsel advised the trial court that the recording did not need to be redacted because it was not "fair to the State" to ask them to redact portions of the conversation and later argue the recording was manipulated.

Trial counsel testified he was hired by the petitioner to represent the petitioner on pending rape of a child charges in Lewis County. Prior to the petitioner's preliminary hearing, trial counsel attempted to obtain a copy of the recorded conversation between the petitioner and the victim but was unsuccessful. Trial counsel later received a copy of the recording in discovery, and, after he and the petitioner listened to it, the petitioner insisted the male voice on the recording was not his. Although trial counsel believed it was the petitioner's voice, the petitioner hired Mr. Owen to analyze the recording for inconsistencies. Because Mr. Owen's initial report indicated the recording was in an unusual format, trial counsel contacted the prosecutor to obtain a "strike off of the

---

[2] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) (holding Federal Rule of Evidence 702 requires consideration "of whether the reasoning or methodology underlying [expert] testimony is scientifically valid and of whether the reasoning or methodology properly can be applied to the facts in issue").

original recording" and sent the second recording to Mr. Owen for analysis. This second recording was later played for the jury at the petitioner's trial.

Because the recording was "so devastating," trial counsel's trial strategy was to attack its authenticity. The petitioner first took the position that the voice on the recording was not his. However, when trial counsel was unable to find an expert who agreed with this conclusion, the petitioner next theorized the victim used her expertise in audio engineering to splice together snippets of several conversations with the petitioner and then scripted her side of the conversation to play against the petitioner's manufactured responses. However, at Mr. Owen's *Daubert* hearing, he testified the recording contained "pauses and clicks" which were the result of "manipulation by the operator of the recording device" and "cell tower transmission." Additionally, while Mr. Owen testified it was possible to manipulate a recording in the manner theorized by the petitioner, Mr. Owen did not believe that had happened in this case. Trial counsel was frustrated because Mr. Owen's testimony at the hearing differed greatly from his initial report. Although Mr. Owen found a large number of inconsistencies in the first recording, when he analyzed the second recording taken from the Lewis County Sheriff's Department's server, he discovered "80 percent . . . of these problems . . . were the result of this being a recording as opposed to a one-off from the digital version." The few inconsistencies that remained on the second recording did not advance the petitioner's theory. Overall, trial counsel believed Mr. Owen's testimony at the pre-trial hearing "went extremely poorly for him," and trial counsel was afraid Mr. Owen would fall apart on cross-examination if he testified at trial. Because Mr. Owen's pre-trial testimony contradicted much of his initial report, trial counsel believed "the only benefit to Mr. Owen as a witness would be to confuse the less intelligent jurors" on the panel.

Additionally, following Mr. Owen's testimony at the *Daubert* hearing, trial counsel spoke to Mr. Owen about his travel plans for the petitioner's trial. Mr. Owen informed trial counsel he would need several thousand dollars for airfare, hotel accommodations, and time. Mr. Owen explained he needed the additional money because he had used the petitioner's funds to pay for travel expenses associated with the petitioner's prior trial date, and, although he obtained refunds when the trial was continued, any money paid to him was nonrefundable. The petitioner was unable to pay the additional expenses, and, because trial counsel now believed Mr. Owen was "a charlatan and a fraud," he made a strategic decision not to call Mr. Owen to testify at trial.

On cross-examination, trial counsel testified he would not be surprised to learn Mr. Owen signed a sworn affidavit stating he was not able to recoup his original travel expenses because "Mr. Owen says whatever he needs to say to make himself look better." However, trial counsel reiterated Mr. Owen told him that he "got most of [the money he

spent on travel expenses] back" but refused to testify without additional funds. Although trial counsel agreed the jury, as the triers of fact, assigns weight to expert testimony, trial counsel believed any "minuscule benefit" obtained by Mr. Owen's testimony would be "greatly outweighed" by his performance on cross-examination.

After trial counsel made the decision not to call Mr. Owen to testify, he focused his trial strategy on attacking the credibility of the victim and establishing the petitioner did not have his cell phone on the day of the recorded conversation. Trial counsel researched the victim's forged loan documents and time sheets. However, because the victim admitted to signing her uncle's name on the loan documents and altering the time sheets, trial counsel was unable to introduce any extrinsic evidence. Furthermore, although the petitioner indicated the victim had an arrest record for theft, trial counsel was unable to locate any convictions for the victim. Trial counsel also researched television shows that were airing at the time of the rapes to poke holes in the victim's timeline. The victim testified *Dharma and Greg* was playing shortly before one of the rapes occurred. However, trial counsel was able to present evidence that the show was not in syndication during the year the victim alleged she was raped and would not have aired at 10:30 p.m.

Because the petitioner's strategy at trial was to attack the authenticity of the recording, trial counsel testified he could not ask the State to redact the victim's younger sister's name from the recording and later argue the same recording was manipulated or altered. Additionally, the portion of the recording that contained the references to the victim's younger sister also included the purported anomalies. If this portion of the recording was redacted, the jury would be unable to hear these anomalies.

Trial counsel testified he and the petitioner reviewed the bill of particulars within a month of the petitioner's trial. Because the victim testified at the preliminary hearing that she and the petitioner had sex on a daily basis for several years, the petitioner needed to decide whether he wanted to attack the victim's story of daily sex as "impossible, implausible and incredible" or whether they would eliminate the introduction of evidence of possible grooming by attacking only the four incidents listed in the bill of particulars. After weighing both options, the petitioner decided to limit the victim's testimony to only the incidents listed in the bill of particulars. While reviewing the bill of particulars, trial counsel asked the petitioner if he had an alibi for any of the incidents. However, the petitioner was not able to provide any names or other information for trial counsel to investigate. Without this information, the only way to introduce the alibis at trial was through the petitioner's testimony, and the petitioner chose not to testify.

On cross-examination, trial counsel acknowledged the petitioner told him that he drove the church bus on Thursdays instead of Wednesdays. However, trial counsel did

not believe this was helpful because the petitioner could not provide church records to show when he drove the bus or the name of someone who could verify his story. Additionally, there was nothing to stop the victim from admitting she was mistaken about the day of the week on which the rape occurred. The petitioner also told trial counsel he was on vacation in Florida during one of the dates. However, trial counsel did not want to explore this alibi at trial because the victim was with the petitioner during this trip, and trial counsel was afraid the petitioner would be susceptible to prosecution in Florida.

Approximately two weeks prior to trial, the State offered the petitioner a plea deal of ten years at 100 percent. Although trial counsel was "extremely excited" about the offer, the petitioner told trial counsel he could not plead guilty to something he did not do. The State agreed to let the petitioner enter a best interest plea, but the petitioner was not convinced and requested to speak with his family. Trial counsel arranged a phone call between the petitioner and his sister, who encouraged the petitioner to accept the offer. However, after speaking with his sister, the petitioner told trial counsel he was unable to accept the offer.

Because trial counsel believed the possibility of the petitioner being convicted was "alarmingly strong" and he wanted to protect himself against future post-conviction proceedings, trial counsel asked the petitioner to sign a piece of paper acknowledging the terms of the offer and that he rejected those terms. The petitioner initially refused to do so, and the trial court ultimately ordered the petitioner to sign the paper. Trial counsel testified, at the time the offer was rejected, the petitioner knew it was unlikely that Mr. Owen would testify at trial. Additionally, at no time during the trial did the petitioner tell trial counsel he had changed his mind about accepting the offer. If the petitioner had done so, trial counsel would have asked the State if the offer was still available.

At the conclusion of the post-conviction hearing, because the petitioner was "rambling" throughout his extensive testimony, the post-conviction court did not have "a clear understanding of what facts [the p]etitioner relie[d] on" to support his claims of ineffective assistance of counsel. Therefore, the post-conviction court ordered post-conviction counsel to prepare a final summation of the petitioner's claims. The petitioner's summation was filed on June 28, 2018, and included the following claims:

a. [Trial counsel] failed to adequately challenge the State's expert;

b. [Trial counsel] failed to call an expert to testify on behalf of [the p]etitioner at his trial;

c. [Trial counsel] failed to introduce an alibi defense and did not review the [b]ill of [p]articulars with [the p]etitioner; and

- 15 -

d.      [Trial counsel] failed to adequately advise [the p]etitioner regarding the State's offer.

On July 11, 2018, the petitioner filed a pro se motion seeking time to amend the summation to include an additional claim against appellate counsel. However, because the petitioner was represented by counsel, the post-conviction court granted post-conviction counsel ten days to add the appellate claim if she deemed it appropriate. On July 18, 2018, post-conviction counsel filed a response stating she had reviewed the petitioner's claims against appellate counsel and found they either lacked merit or were addressed at the post-conviction hearing.

After its review of the evidence presented, the post-conviction court denied relief. The petitioner waived his right to counsel, and this timely appeal followed.

*Analysis*

On appeal, the petitioner asserts trial counsel was ineffective for failing to call an expert witness; failing to object to 404(b) evidence; failing to request a *Daubert* hearing; failing to adequately advise the petitioner regarding a plea offer; failing to properly request a continuance; failing to send the recorder to Mr. Owen for analysis; and failing to provide the petitioner with the bill of particulars. The petitioner also asserts appellate counsel was ineffective for failing to withdraw as counsel; failing to inform the petitioner of his right to appeal to the supreme court; and failing to raise non-frivolous issues on direct appeal. Finally, the petitioner argues the post-conviction court prematurely ended the post-conviction hearing; the State committed a *Brady* violation by erasing the original recording from the recorder; the State denied the petitioner due process by playing the entire recording at trial; the trial court committed plain error by severing the petitioner's offenses and allowing the State to use the victim's younger sister's name during the trial; and cumulative error warrants a new trial.[3]

## I.      Trial Counsel

The petitioner bears the burden of proving his post-conviction factual allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f). The findings of fact established at a post-conviction evidentiary hearing are conclusive on appeal unless the evidence preponderates against them. *Tidwell v. State*, 922 S.W.2d 497, 500 (Tenn. 1996). This Court will not reweigh or reevaluate evidence of purely factual issues.

---

[3] For the sake of clarity, we have reordered and renumbered the issues from the order they appeared in the petitioner's brief.

*Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997). However, appellate review of a trial court's application of the law to the facts is *de novo,* with no presumption of correctness. *See Ruff v. State*, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel presents mixed questions of fact and law. *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). Thus, this Court reviews the petitioner's post-conviction allegations *de novo,* affording a presumption of correctness only to the post-conviction court's findings of fact. *Id.*; *Burns v. State*, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner must show both that counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceedings. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the standard for determining ineffective assistance of counsel applied in federal cases is also applied in Tennessee). The *Strickland* standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687. In order for a post-conviction petitioner to succeed, both prongs of the *Strickland* test must be satisfied. *Id*. Thus, courts are not required to even "address both components of the inquiry if the defendant makes an insufficient showing on one." *Id*.; *see also Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996) (stating that "a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

A petitioner proves a deficiency by showing "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688; *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the *Strickland* test is satisfied when the petitioner shows there is a reasonable probability, or "a probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. However, "[b]ecause of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be

- 17 -

considered sound trial strategy.'" *Id*. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

## A. Failure to Call Expert Witness

The petitioner argues trial counsel was ineffective for failing to present Mr. Owen at trial. The petitioner contends Mr. Owen's testimony would have raised a reasonable doubt concerning the petitioner's participation in the recorded conversation. The State contends trial counsel's decision not to call Mr. Owen was strategic. As to this issue, the post-conviction court made the following findings:

> The [c]ourt finds that [t]rial [c]ounsel's decisions regarding Mr. Owen were well-informed and a result of adequate preparation. Trial [c]ounsel articulated many sound reasons in support of his decision not to call Mr. Owen as an expert witness. [The p]etitioner's argument is made with the benefit of hindsight, a benefit to which he is not entitled to for purposes of supporting his [p]ost-[c]onviction petition.

At the evidentiary hearing, the petitioner testified he paid Mr. Owen $9,500 to perform a forensic analysis of the recording. According to the petitioner, Mr. Owen's findings "vindicated" him, and the petitioner believed Mr. Owen would testify about these findings at the trial. However, trial counsel told the petitioner Mr. Owen requested an additional $17,000 for travel expenses and his time. The petitioner was unable to pay the $17,000 but believed trial counsel would request the funds from the trial court. Trial counsel testified he became frustrated with Mr. Owen when his testimony at the pre-trial hearing differed greatly from his initial report. Trial counsel did not believe Mr. Owen's testimony would advance the petitioner's theory of how the recording was made, and trial counsel was afraid Mr. Owen would fall apart on cross-examination. While Mr. Owen's initial report appeared favorable to the defense, after Mr. Owen analyzed a second copy of the recording, he withdrew many of his previous conclusions. Additionally, although Mr. Owen told trial counsel he was able to recoup his travel expenses from the petitioner's previous trial date, Mr. Owen demanded additional money before agreeing to testify. Therefore, trial counsel made a strategic decision not to call Mr. Owen as an expert witness.

Although the petitioner argues Mr. Owen's testimony was necessary to raise a reasonable doubt about the authenticity of the recording, he failed to present Mr. Owen at the post-conviction hearing. "To succeed on a claim of ineffective assistance of counsel for failure to call a witness at trial, a post-conviction petitioner should present that witness at the post-conviction hearing." *Pylant v. State*, 263 S.W.3d 854, 869 (Tenn. 2008) (citing *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990)). "As a

- 18 -

general rule, this is the only way the petitioner can establish that . . . the failure to have a known witness present or call the witness to the stand resulted in the denial of critical evidence which inured to the prejudice of the petitioner." *Id.* Because the petitioner failed to call Mr. Owen at the post-conviction hearing, he cannot meet his burden. *Id.*

Additionally, trial counsel's testimony indicates he made a strategic and well informed decision not to call Mr. Owen at trial because trial counsel believed any "minuscule" benefit to the petitioner would be outweighed by Mr. Owen's testimony on cross-examination, and trial counsel believed Mr. Owen was a "charlatan" for demanding additional money. Implicit in the post-conviction court's order denying relief is an accreditation of trial counsel's testimony, and nothing in the record preponderates against the post-conviction court's factual findings. *See Tidwell*, 922 S.W.2d at 500. In addition, the fact that a trial strategy or tactic failed or was detrimental to the defense does not, alone, support a claim for ineffective assistance of counsel. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). Deference is given to sound tactical decisions made after adequate preparation for the case. *Id.* The petitioner is not entitled to relief on this issue.

**B.      Failure to Object to 404(b) Evidence**

The petitioner argues trial counsel was ineffective for failing to object to the State's repeated mentions of a second accuser, the victim's younger sister. The petitioner contends this evidence was used to "inflame the passions of the jury" and create "an unfair atmosphere that permeated the entire trial." The State contends the petitioner has waived this issue for failing to include it in his final summation.

Our review of the record shows that while the petitioner included this issue in his pro se petition, he failed to pursue it in either of his amended petitions for post-conviction relief, and he did not specifically incorporate the issues raised in his pro se petition into his amended petitions. *See Dennis Evans v. State*, No. W2017-01619-CCA-R3-PC, 2018 WL 4961490, at *10 (Tenn. Crim. App. Oct. 15, 2018) (holding the petitioner abandoned his claim by failing to specifically incorporate his pro se post-conviction petition into his two amended petitions), *no perm. app. filed*. Furthermore, when directed by the post-conviction court to present a summary of the claims upon which he was seeking relief, the petitioner failed to identify this issue. As a result, the post-conviction court did not render a ruling on this issue in its order denying relief.

Because the issue was not before the post-conviction court and no ruling was rendered, we are precluded from review. Issues not raised in the post-conviction petition cannot be raised for the first time on appeal. *Cauthern v. State*, 145 S.W.3d 571, 599

(Tenn. Crim. App. 2004) ("[A]n issue raised for the first time on appeal is waived."). The petitioner has waived review of this issue.

## C.    Failure to Request *Daubert* Hearing

The petitioner argues trial counsel was ineffective for failing to request a *Daubert* hearing to determine whether the State's expert was qualified to testify at trial. The petitioner contends the hearing held prior to trial was not sufficient to determine whether the State's expert's testimony was admissible. The State contends the petitioner has waived this issue.

While the petitioner challenged other aspects of trial counsel's performance, the petitioner failed to challenge trial counsel's decision not to request an additional *Daubert* hearing in his original or amended petitions for post-conviction relief. Additionally, although both the petitioner and trial counsel provided testimony regarding the State's expert's qualifications, this issue was not included in the petitioner's final summation, and the post-conviction court made no rulings on the issue. Issues not raised in the post-conviction petition cannot be raised for the first time on appeal. *Cauthern*, 145 S.W.3d at 599 ("[A]n issue raised for the first time on appeal is waived."). The petitioner has waived review of this issue.

## D.    Failure to Adequately Advise the Petitioner Regarding a Plea Offer

The petitioner argues trial counsel was ineffective for failing to adequately advise him regarding a plea offer. The petitioner contends his rejection of the plea offer was not knowing due to trial counsel's failure to advise the petitioner that Mr. Owen would not be testifying at trial. The State contends the petitioner has failed to meet his burden. As to this issue, the post-conviction court made the following findings:

> The [c]ourt finds that [t]rial [c]ounsel went to great lengths to preserve evidence of the State's offer to [the p]etitioner. Trial [c]ounsel made sure [the p]etitioner was aware of the offer and told [the p]etitioner he believed that it was in [the p]etitioner's best interest to accept the offer. [The p]etitioner expressly acknowledged his choice to reject the State's offer when he signed the August 6, 2014 document.

> The evidence establishes that [t]rial [c]ounsel fully informed [the p]etitioner of the advantages and disadvantages of his decision to reject the plea offer. Accordingly, the [c]ourt finds that [t]rial [c]ounsel was not deficient in his explanation of the terms of the plea agreement to [the p]etitioner.

When a petitioner alleges he rejected a plea offer due to the ineffective assistance of counsel, he:

> has the burden to show by a reasonable probability that, but for counsel's deficient representation, (1) he . . . would have accepted the plea, (2) the prosecution would not have withdrawn the offer, and (3) the trial court would have accepted the terms of the offer, such that the penalty under its terms would have been less severe that the penalty actually imposed.

*Nesbit v. State*, 452 S.W. 3d 779, 800-01 (citing *Lafler v. Cooper*, 132 S.Ct. 1376, 1385 (2012)).

At the post-conviction hearing, the petitioner testified the State presented a plea offer of ten years at 100 percent to resolve the charges related to both the victim and the victim's younger sister. The petitioner rejected this offer because he believed the trial was going to be continued to allow Mr. Owen to analyze the original recorder. However, if he had known Mr. Owen was not going to testify, the petitioner would have accepted the offer. During the trial, when the petitioner learned Mr. Owen was not testifying, the petitioner told trial counsel he wanted to take the offer but was told it was "too late." Trial counsel testified he was "extremely excited" about the offer and, after discussing the possibility that Mr. Owen may not testify at trial, encouraged the petitioner to accept it. After the petitioner initially rejected the offer, the State agreed to let the petitioner enter a best interest plea, and trial counsel allowed the petitioner to discuss the offer with his sister. When the petitioner ultimately decided to reject the offer, trial counsel wrote the details of the offer on a piece of paper and asked the petitioner to sign it, acknowledging he had rejected the offer. The petitioner refused, and the trial court ordered the petitioner to sign the paper.

The petitioner acknowledged trial counsel discussed the terms of the plea offer with him and agreed he ultimately rejected the State's offer. Trial counsel testified, when he and the petitioner discussed the risks associated with proceeding to trial, he told the petitioner there was a possibility Mr. Owen would not testify. The post-conviction court accredited the testimony of trial counsel, and nothing in the record preponderates against the findings of the post-conviction court. *See Tidwell*, 922 S.W.2d at 500. Furthermore, as the post-conviction court noted, the petitioner's signed note acknowledged his decision to reject the offer. Accordingly, we conclude trial counsel's performance was not deficient during the petitioner's plea negotiations. The petitioner is not entitled to relief on this issue.

## E.     Failure to Properly Request Continuance

The petitioner argues trial counsel was ineffective for failing to request a continuance in writing following the pre-trial hearing on August 6, 2014. Specifically, the petitioner contends trial counsel's failure to properly request a continuance precluded Mr. Owen from analyzing the recorder. The State contends the petitioner has waived this issue for failing to include it in his final summation.

Although the petitioner included this issue in his pro se petition, he failed to pursue it in either of his amended post-conviction petitions, and, as discussed above, he did not specifically incorporate the issues raised in his pro se petition into his amended petitions. *See Dennis Evans*, 2018 WL 4961490 at *10 (holding the petitioner abandoned his claim by failing to specifically incorporate his pro se post-conviction petition into his two amended petitions). Furthermore, the petitioner failed to identify this issue in his final summation following the post-conviction hearing. As a result, the post-conviction court did not render a ruling on this issue in its order denying relief.

Because the issue was not before the post-conviction court and no ruling was rendered, we are precluded from review. Issues not raised in the post-conviction petition cannot be raised for the first time on appeal. *Cauthern*, 145 S.W.3d at 599 ("[A]n issue raised for the first time on appeal is waived."). The petitioner has waived review of this issue.

## F.     Failure to Send Recorder to Mr. Owen

The petitioner argues trial counsel was ineffective for failing to send the recorder to Mr. Owen for analysis. The State contends the petitioner has waived this issue for failing to include it in his final summation.

Although the petitioner now argues trial counsel was ineffective for failing to send Mr. Owen the recorder, the petitioner failed to challenge this aspect of trial counsel's performance in his original or amended petitions for post-conviction relief. Furthermore, although both the petitioner and trial counsel provided ample testimony regarding the recorder and trial counsel's decision not to send it to Mr. Owen, this issue was not included in the petitioner's final summation, and the post-conviction court made no rulings on the issue. Issues not raised in the post-conviction petition cannot be raised for the first time on appeal. *Cauthern*, 145 S.W.3d at 599 ("[A]n issue raised for the first time on appeal is waived."). The petitioner has waived review of this issue.

## G.     Failure to Provide Bill of Particulars

The petitioner argues trial counsel was ineffective for failing to provide the petitioner with the bill of particulars. The petitioner contends, if he had reviewed the bill of particulars, he would have provided trial counsel with alibis for several of the dates given by the victim. The State contends the petitioner has failed to meet his burden.

The post-conviction court made the following findings regarding this issue:

Trial [c]ounsel reviewed the [b]ill of [p]articulars with [the p]etitioner prior to trial and discussed each and every allegation as well as possible defense strategies. Trial [c]ounsel asked [the p]etitioner to provide any names, records, or witnesses to help establish an alibi. Trial [c]ounsel pursued [the p]etitioner's proffered alibis and was never made aware of any records that would have corroborated [the p]etitioner's alibi. Absent any records, [the p]etitioner's only other option was to testify about occasions when he drove the church van and challenge the victim's credibility. However, [the p]etitioner chose not to testify at trial.

The [c]ourt finds that [the p]etitioner has not submitted any proof on this ground that establishes by clear and convincing evidence that [t]rial [c]ounsel's conduct fell below the acceptable standard of competence required of attorneys representing criminal defendants. As such, [the p]etitioner's argument regarding this ground is without merit.

At the post-conviction hearing, the petitioner testified he and trial counsel did not review the indictment or bill of particulars in his case. If the petitioner had known the specific dates of the alleged rapes, he would have provided trial counsel with information about possible alibis. Trial counsel testified he and the petitioner reviewed the bill of particulars prior to trial. Although the petitioner told trial counsel about possible alibis, the petitioner was unable to provide trial counsel with any evidence to support them or witnesses trial counsel could interview. Trial counsel testified the alibi information could have been introduced through the petitioner's trial testimony. However, the petitioner chose not to testify.

The post-conviction court accredited the testimony of trial counsel, and nothing in the record preponderates against its findings. *See Tidwell*, 922 S.W.2d at 500. Furthermore, although the petitioner argues trial counsel should have investigated alibi witnesses or introduced evidence to support his alibi, the petitioner failed to present any witnesses or evidence at the post-conviction hearing, and, therefore cannot establish prejudice. *See Black*, 794 S.W.2d at 757-58; *see also State v. Harbison*, 704 S.W.2d 314,

319 (Tenn. 1986) (ineffective assistance of counsel not found where counsel did not investigate unknown alibi witnesses). The petitioner is not entitled to relief on this issue.

## II.    Appellate Counsel

### A.    Failure to Withdraw as Appellate Counsel and Inform the Petitioner of His Right to File a Rule 11 Application

The petitioner argues appellate counsel was ineffective for failing to withdraw as counsel and inform the petitioner of his right to file a Rule 11 application. The State contends the petitioner waived this issue by abandoning it at the trial level.

Following the submission of his final summation, the petitioner filed a pro se motion to amend the summation with claims against appellate counsel. The post-conviction court granted post-conviction counsel ten days to review the issue and amend the summation if she believed the claims had merit. Post-conviction counsel subsequently filed a response, stating the claims regarding appellate counsel either lacked merit or were addressed at the post-conviction hearing. Although the petitioner now argues he did not agree with post-conviction counsel's exclusion of this issue from the final summation, "[w]aiver in the post-conviction context is to be determined by an objective standard under which a petitioner is bound by the action or inaction of his attorney." *House v. State*, 911 S.W.2d 705, 714 (Tenn. 1995).

Furthermore, the petitioner failed to include this issue in his amended petitions for post-conviction relief, and he did not specifically incorporate the issues raised in his pro se petition into his amended petitions. *See Dennis Evans*, 2018 WL 4961490 at *10 (holding the petitioner abandoned his claim by failing to specifically incorporate his pro se post-conviction petition into his two amended petitions). The petitioner has waived review of this issue.

### B.    Failure to Raise Non-Frivolous Issues on Appeal

The petitioner argues appellate counsel was ineffective for failing to raise non-frivolous issues on direct appeal. Specifically, the petitioner contends he orally raised the 404(b) evidence issue at the motion for new trial hearing and advised appellate counsel to include the issue in the direct appeal. The State contends the petitioner has waived this issue by abandoning it at the trial level.

As discussed above, the post-conviction court directed post-conviction counsel to review the petitioner's claims regarding appellate counsel and amend the final summation if she believed the issues had merit. Post-conviction counsel chose not to amend the final

summation with the appellate issues because she did not believe the issues had merit or they were previously addressed. The petitioner is bound by the actions of his counsel. *See House*, 911 S.W.2d at 714. The issue has been waived, and the petitioner is not entitled to relief.

## C.      Post-Conviction Court Error

The petitioner argues the post-conviction court erred in failing to allow the petitioner to proceed on his pro se motion to amend the final summation. The petitioner contends the post-conviction court has "so far departed from the accepted and usual course of judicial proceedings that it has in fact judicially estopped the petitioner from exhausting his constitutional claims" in the trial court. The State contends the petitioner has waived this issue.

Although he was represented by post-conviction counsel, the petitioner filed a pro se motion to amend the final summation. However, "a defendant in a criminal case may not proceed pro se while simultaneously being represented by counsel." *State v. Davis*, 141 S.W.3d 600, 615 n.12 (Tenn. 2004) (citing *Wallace v. State*, 121 S.W.3d 652, 655 n.2 (Tenn. 2003)). Consequently, the post-conviction court ordered post-conviction counsel to determine whether the petitioner's claims had merit and, if so, to amend the final summation accordingly. Post-conviction counsel reviewed the claims and determined they either lacked merit or were previously addressed. Because the post-conviction court allowed post-conviction counsel to review the claims and amend the final summation, the petitioner was not "judicially estopped" from exhausting his claims at the trial court level. The petitioner is not entitled to relief on this issue.

## D.      *Brady*, Due Process, and Severance

The petitioner argues the State committed a *Brady* violation by erasing the original recording from the recorder before the recording could be authenticated; the State denied the petitioner due process by playing the full recording at trial; and the trial court erred by severing the petitioner's offenses and allowing the State to use the name of the victim's younger sister. The State contends the petitioner has waived these issues by failing to challenge them on direct appeal.

Under Tennessee Code Annotated section 40-30-106:

(g) A ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented unless:

(1) The claim for relief is based upon a constitutional right not recognized as existing at the time of trial if either the federal or state constitution requires retroactive application of that right; or

(2) The failure to present the ground was the result of state action in violation of the federal or state constitution.

"[T]he petitioner is bound by the action or inaction of his attorney." *House*, 911 S.W.2d at 706. Because the petitioner could have presented these issues for our review on direct appeal but chose not to, they are waived.

Furthermore, none of these issues were included in the petitioner's final summation, and the post-conviction court did not render a ruling on them in its order denying relief. Because the issues were not before the post-conviction court and no ruling was rendered, we are precluded from review. Issues not raised in the post-conviction petition cannot be raised for the first time on appeal. *Cauthern*, 145 S.W.3d at 599 ("[A]n issue raised for the first time on appeal is waived."). The petitioner is not entitled to relief.

## E.    Cumulative Error

Finally, the petitioner contends the cumulative effect of the errors alleged above entitles him to a new trial. "To warrant assessment under the cumulative error doctrine, there must have been more than one actual error committed in the trial proceedings." *State v. Hester*, 324 S.W.3d 1, 77 (Tenn. 2010). Because the petitioner has not established any error, he is not entitled to relief under the cumulative error doctrine.

## Conclusion

Based upon the foregoing authorities and reasoning, we affirm the post-conviction court's judgment denying the petitioner post-conviction relief.

_____
J. ROSS DYER, JUDGE