IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
July 14, 2020 Session

## BRIAN PILLOW v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Maury County**
**No. 25630     Stella L. Hargrove, Judge**

_____

### No. M2018-01275-CCA-R3-PC

_____

Petitioner, Brian Pillow, was convicted by a Maury County Jury of three counts of selling .5 grams or more of cocaine in a drug-free zone. He received an effective sentence of twelve years to be served in the Tennessee Department of Correction. Petitioner filed a petition seeking post-conviction relief, in which he alleged that he received the ineffective assistance of counsel and that the trial court should have granted a continuance when co-counsel was appointed. Following an evidentiary hearing, the post-conviction court denied his petition. We affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR. and TIMOTHY L. EASTER, JJ., joined.

Michael Meise, Dickson, Tennessee (on appeal) and Kevin S. Latta, Columbia, Tennessee (at trial) for the appellant, Brian James Pillow.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Assistant Attorney General; Brent A. Cooper, District Attorney General; and Adam Davis, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

*Background*

The evidence presented at trial, was as follows:

Columbia Police Detective Jason Dark testified that in May 2012, Kevin Odie, a "street-level" drug dealer, was charged with narcotics offenses.

Thereafter, Odie approached the District Attorney General and offered to work as a confidential informant in an attempt to obtain leniency on his charges. Odie spoke with Detective Dark about purchasing drugs from certain individuals, including the [Petitioner].

Detective Dark said that Odie purchased crack cocaine from the [Petitioner] on three occasions: May 2, 2012; May 4, 2012; and May 11, 2012. The procedures before and after each transaction were largely identical. Odie telephoned [Petitioner], who agreed to sell the drugs and gave directions to a specific location. Immediately after each call, officers searched Odie and his vehicle to ensure he had no contraband. The officers photocopied the money to be used during the purchase then gave Odie the cash to purchase two grams of cocaine. On May 2, Odie was given $100; on May 4, he was given $130; and on May 11, he was given $150. Detective Dark did not know why the price continually increased.

Detective Dark recalled that before each transaction, Odie was equipped with an audio/video recording device. The recording equipment was set up so that Detective Dark could hear the transaction as it occurred, but he could not view the video until he recovered the device from Odie and downloaded the recording to a computer.

Detective Dark said that after being searched and given money, Odie drove to 501 Martin Drive as directed by [Petitioner]. The location was approximately 698 feet from Fairview Park. The May 2 purchase occurred in a shed on the property, the May 4 purchase occurred in the yard, and the May 11 purchase occurred inside a maroon sport utility vehicle (SUV) that was parked in the driveway. Detective Dark said that the SUV was registered to Tonya Perry, who had "associated with" [Petitioner].

Detective Dark said that after each purchase, Odie met with the police and gave them a substance that was packaged in a plastic sandwich baggie and appeared to be crack cocaine. The detective sent the substances to the Tennessee Bureau of Investigation (TBI) crime laboratory for testing. He said that the amount of drugs Odie received was larger than the amount the police typically obtained for the amount of money provided.

On cross-examination, Detective Dark said that the price for one gram of crack cocaine was usually $100; however, Odie received more than two grams during each purchase. Odie was given $150 for the third

transaction. After the transaction, Odie returned $10 and explained that he paid $140 for the drugs.

Detective Dark said that prior to each transaction, Odie's vehicle was searched in a well-lit garage. He could not recall whether he or another officer searched the vehicle but stated that [i]t's just protocol. It's something we do. He explained that the officers did not "strip search" an informant but that all of the informant's pockets were checked. He did not check inside Odie's socks or shoes because he trusted Odie. Detective Dark stated that [Petitioner] was not arrested on the day of the last transaction; however, he was arrested in December 2012 after the grand jury returned an indictment against him. At the time of his arrest, [Petitioner] was in possession of $1,400 in cash. None of the bills matched the serial numbers of the cash used in the controlled purchases.

Detective Dark said that while working as a confidential informant, Odie made over 100 controlled buys from approximately forty individuals.

Kevin Odie testified that he had three prior felony convictions, two for selling crack cocaine and one for selling marijuana. He also had two pending charges of selling crack cocaine in a school zone and one pending charge of selling marijuana. He volunteered to buy crack cocaine for the police, hoping that his assistance would keep him from being incarcerated.

Odie testified that his nickname was "Kap." He had known [Petitioner], whose nickname was "Bear," for approximately one year. Odie's first purchase of crack cocaine from [Petitioner] occurred on May 2, 2012. On that day, Odie called [Petitioner], and they arranged to meet so that Odie could buy one gram of cocaine. [Petitioner] told Odie the crack cocaine would cost $100. Odie went to the meeting with a woman he "used to call [his] wife." Prior to leaving for the meeting, Odie, his companion, and the inside of the white Ford Explorer Odie was driving were searched by the police. The officers found no money or drugs. The police equipped Odie with recording equipment and provided him with money prior to the transaction. The video recording, which was played for the jury, captured the entire transaction. As the recording was played, Odie explained what was depicted. The video showed Odie driving to the meeting. During the drive, he called [Petitioner], who told him to come to a location near Fairview Park. Prior to his arrival, Odie called [Petitioner] to let him know he was on his way. During the conversation, [Petitioner] gave directions to his exact location. As they talked, Odie told [Petitioner], "'I got a bill,'" which meant $100.

[Petitioner] responded, "'I gotcha,'" and indicated that Odie should "come on." Odie identified his and [Petitioner's] voices on the recording.

Odie said that after approximately ten or fifteen minutes, he arrived at the designated location. He saw a white house with an unattached brown shed, which he identified on the recording. As he walked toward the shed, [Petitioner] opened the door. Odie identified [Petitioner] as the person seen on the recording. Odie stepped inside the shed and saw another man with [Petitioner]. [Petitioner] said that he did not know whether Odie "wanted it soft or hard," meaning powder or crack cocaine, respectively. Odie indicated he wanted crack cocaine. Odie explained that the video showed [Petitioner] getting the drugs out of a "dope sack." [Petitioner] weighed the crack cocaine then told Odie, "'I gave you 2.5 [grams],'" which was more than Odie had requested. Odie said that he would "definitely holler back at him again" for more crack cocaine. After [Petitioner] gave Odie the crack cocaine, Odie put $100 on the table; however, he never saw [Petitioner] pick up the money. Afterward, Odie returned to the Explorer, called Detective Dark, and advised him that he was on his way to meet with the officers. Odie did not stop anywhere along the way. As soon as he arrived at the designated location, Odie relinquished the crack cocaine to the officers and described the transaction.

Odie said that on May 4, 2012, he again met with the officers prior to meeting with [Petitioner]. The police searched Odie, his vehicle, and his female companion and set up the recording equipment. The recording of the transaction was played for the jury, during which Odie again explained what was happening and identified [Petitioner]. Odie said that he thought he was supposed to try to buy a larger amount of crack cocaine. Once in Columbia, Odie called [Petitioner], but [Petitioner] was at a barbershop and promised to call Odie when he left the shop. [Petitioner] called a short while later and told Odie to return to the location of their previous meeting. When Odie arrived, [Petitioner] walked toward Odie and handed him a cigarette pack containing crack cocaine. Odie gave [Petitioner] $130. Odie told [Petitioner] that he would likely "holler at" him again. When the transaction was complete, Odie called Detective Dark and arranged to meet the officers. Upon arrival, Odie relinquished the drugs and provided details of the encounter.

Odie said that the final purchase took place on May 11, 2012, at the same location near Fairview Park. Once again, the police gave Odie

recording equipment and searched Odie and his vehicle before he left. The recording of the transaction was played for the jury, and Odie narrated what transpired on the video. When Odie arrived at the location, [Petitioner] was sitting in the driver's seat of a maroon SUV, and a man named Huey was sitting in the front passenger seat. Odie got into the backseat of the vehicle. [Petitioner] handed Odie the crack cocaine without turning around and indicated that he was giving Odie three grams of crack cocaine. Odie told [Petitioner] he had $150, but [Petitioner] said the price was only $140. Odie kept $10 and gave [Petitioner] $140. Afterward, Odie met with the officers, returned the $10, and relinquished the crack cocaine.

Odie said that during each transaction, he dealt exclusively with [Petitioner]. The location of the transactions and the price of the drugs were determined by [Petitioner].

The State then asked the trial court to have [Petitioner] "step forward before the jury and display his bare arms to the jury." Following the trial court's instructions, [Petitioner] removed his long-sleeved shirt, rolled up the sleeves of his t-shirt, and showed his arms, which were tattooed, to the jury.

On cross-examination, Odie said that the State had not promised him anything for his assistance but that he hoped his cooperation would work in his favor on his pending charges. He acknowledged that he made thirty or forty controlled drug buys for the police and that the purchases were made from several individuals.

On redirect, Odie acknowledged that he was in "big trouble" as a result of his pending charges and that he had volunteered to help the State, hoping he could avoid returning to prison. He stated, however, that the State never asked him to purchase drugs specifically from [Petitioner]. Odie said that he did not see [Petitioner] pick up the money during the first transaction; however, he left the money on the table for [Petitioner] in exchange for the crack cocaine.

After Odie testified, the parties stipulated that Fairview Park was a drug free zone pursuant to Tennessee Code Annotated section 39-17-432(b)(1).

Brett Trotter, a forensic scientist with the TBI, testified that he received three separate packages from the Columbia Police Department. Each package contained a plastic sandwich bag containing crack cocaine. The

first bag contained 2.39 grams, the second bag contained 2.56 grams, and
the third bag contained 2.90 grams.

*State v. Brian Pillow*, No. M2014-01355-CCA-R3-CD, 2016 WL 1270263, at *1-3
(Tenn. Crim. App. Mar. 31, 2016), *perm. app. denied* (Tenn. Aug. 18, 2016).  Petitioner's
convictions and sentences were affirmed on direct appeal.

### Post-Conviction Hearing

At the post-conviction hearing, Petitioner testified that he had three meetings with
trial counsel prior to trial.  They discussed a plea offer during one of those meetings.
Petitioner agreed that the State made one plea offer to him but he understood that trial
counsel was seeking a better offer.  Petitioner testified: "So I wouldn't took [sic] the offer
because he's saying he could possibly get me a better plea agreement.  He didn't say for
sure that he was going to but he was going to let me know if he was or wasn't."
Petitioner claimed that no one told him that the first plea offer was a final offer.  He said
that trial counsel came to the Turney Center and spoke with him three days prior to the
trial date.  Petitioner testified that trial counsel asked if he was ready for trial and noted
that the State's plea offer was "off the table."  He claimed that trial counsel never told
him that there was a "timetable' for acceptance of the State's offer or that the offer was a
final one.  Petitioner testified that he did not give the plea offer the same consideration
that he would have given had he known that the offer was a final offer.  Petitioner
asserted that he realized the morning of trial that no plea offer would be accepted.

Petitioner testified that he felt that Kevin Odie's testimony at trial was untruthful
because he said that no promises or deals had been made with him prior to his testimony
in Petitioner's case.  Petitioner asserted that Mr. Odie failed to acknowledge at trial that
his bond had been significantly reduced in exchange for agreeing to work for police,
which Petitioner said that he found out by reading this Court's opinion in *State v. Travis
Lindsey*, M2015-01954-CCA-R3-CD, 2016 WL 5937835 (Tenn. Crim. App. Oct. 12,
2016).  As mentioned in that opinion, Officer Gray testified on cross-examination that
Mr. Odie had pending charges for selling drugs and that Mr. Odie contacted police with
information related to purchasing cocaine.  As a result of his cooperation with police, Mr.
Odie's bond was reduced on April 5, 1012, from $100,000 to $2,500.  Officer Gray
admitted that Mr. Odie's bond was reduced in order for him to help the police.  He also
agreed that "an informant who testified at trial generally received more consideration
than one who remained confidential." *Id*. at *2.

Petitioner asserted at the post-conviction hearing that the State should have
corrected Mr. Odie's perjured testimony at his trial.  He further asserted that the State
knew that "deals" had been made with Mr. Odie, and Petitioner's trial counsel should
have known.  Petitioner believed that Mr. Odie's dishonesty on the witness stand about
the bond reduction was one of Petitioner's "greatest arguments" on post-conviction and

- 6 -

would have affected the outcome of his case. Petitioner was aware that Mr. Odie ultimately pled guilty in his own case and received a two-year suspended sentence.

On cross-examination, Petitioner agreed that he had several drug convictions and a conviction for unlawful possession of a firearm on his record. All of the drug convictions involved possession of cocaine with intent to sell or the sale of cocaine.

Petitioner testified that his discussions with trial counsel went in circles, and trial counsel told him that he might be able to get him a better deal if given more time. He also claimed that trial counsel told him that he did not feel as though he could ever win Petitioner's case. Petitioner testified that the State's plea offer was for the minimum sentence of "[e]ight years at 100 percent." He said that trial counsel did not explain the elements of the crime that he was charged with but he explained the sentencing range for the crimes. Petitioner thought that he faced a potential sentence of thirty-six years if convicted.

Petitioner testified that in the case of *State v. Travis Lindsey*, Officer Gray testified that Mr. Odie's bond reduction was "part of a deal." He said:

> Then Kevin O[die] further testified and agreed with Officer Gray saying that this was part of a deal. So I automatically assumed that my lawyer should have knew [sic] about this deal and should have br[ought] this deal to me. That could have also made me, I don't want to go to trial, I'm going to go ahead and take this deal. But I wouldn't have d[one] none of that with my lawyer telling me you're going to give me a better deal.

Petitioner testified that during Petitioner's trial, trial counsel asked Mr. Odie if any deals or promises had been made to him, and Mr. Odie said no.

Trial counsel testified that he met with Petitioner after being appointed to represent him. He went over each element of the offense with Petitioner and told him that the State would be required to prove each element beyond a reasonable doubt. Trial counsel testified that given the evidence in discovery, Petitioner had a very good chance of being found guilty at trial. Trial counsel did not have a plea offer from the State at the time. Trial counsel testified that the State eventually made a plea offer, and trial counsel timely communicated the offer to Petitioner. He agreed that there were scheduling orders used in Petitioner's case, and there was a plea or settlement deadline in the case. Trial counsel testified that he communicated any plea offers to Petitioner prior to the plea or settlement deadline. He further testified that he spoke with Petitioner about the settlement deadline. Trial counsel asserted: "And that's really one of the main points that I spoke to [Petitioner] about." He never advised Petitioner not to worry about the original plea offer because he was going to obtain a better offer. However, trial counsel testified:

I did talk to him about the possible better offer. I told [Petitioner] the offer, which was eight years at 100 percent. And it was a 100 percent sentence because it was within a thousand feet of Fairfield (sic) Park. And like I said a while ago, I went over each element of that offense with him. I told him that, look, we have got a plea deadline date. That is what is on the table. You don't mess with Judge Hargrove when it comes to plea deadlines. You will go to trial if you don't get it done.

He was - - and I was very sympathetic to him. He was very concerned about his little girl, I believe, that he had just had. And he - - he was very immersed in that really more so than his case. And I have never been in his position. I can certainly understand that. But he was, no, I just can't leave my little girl. And I told him, I said, look, the minimum time that you can get if you go to trial is eight years at 100 percent. That is if Judge Hargrove decides, if you are convicted of all three, that is if Judge Hargrove decides to run each of the offenses together, run them concurrently, and sentence you to the lowest number of years within the range, which is eight years. I said the worse [sic] case scenario would be for you to be sentenced to 12 years on each offense.

\*     \*     \*

And Judge Hargrove ran them consecutively. And I said, given your prior background, given your criminal history, and given Judge Hargrove's reputation as a tough judge, fair but tough, she might do that. And I urged [Petitioner] to think about his daughter in the manner of, you know, if you want to see your daughter, you know, you might want to take this plea. You have an opportunity to knock of[f] 15 percent and get it down to 85 percent for which he would have to serve. I said if you go to trial and you are convicted and the worst happens, you won't ever see your daughter grow up.

Trial counsel testified that he did not place Petitioner's rejection of the plea offer in writing. He asserted that he last discussed the plea offer with Petitioner and reminded him of the plea deadline during a visit with Petitioner at the Turney Center prison. Trial counsel testified:

I said, what I had told him at first, as I testified earlier, was that, okay, this is your plea deadline. This is your plea offer; however, you need to look at this as concrete. This, you have to do this if you want to guarantee and lock in this plea offer, if Judge Hargrove would have accepted it. I believe Her Honor would have. But I can try to get them

- 8 -

to take the within 1,000 feet of a park, or whatever, off because anywhere you go in this town you are within 1,000 feet of a park or a school or a church or somewhere. And there is nowhere you could sell drugs in this town and not be within a thousand feet of something like that, just about.

On cross-examination, trial counsel agreed that he filed a motion to withdraw as Petitioner's counsel. A portion of the motion contained the following language:

Undersigned counsel received an offer from Assistant District Attorney Brent Cooper and undersigned counsel conveyed that offer to the defendant and told the defendant that this Court required defendants to accept and enter into plea agreements roughly one month prior to the scheduled trial date. Undersigned counsel further explained to the defendant that if a criminal defendant did not so timely enter into a plea agreement, that this Court would only allow such a defendant to either, one, plead guilty to all charges in the indictment and have a subsequent sentencing hearing, in other words a blind plea, or have a jury trial.

Trial counsel testified that he explained the scheduling order, which contained the plea deadline date, to Petitioner.

*Analysis*

Before proceeding into the analysis of Petitioner's appellate issues, it is necessary to set forth that Petitioner's counsel, who wrote Petitioner's brief and ably presented oral arguments in Petitioner's case, was appointed by this court to represent Petitioner. The appointment was necessary when Petitioner's initial post-conviction counsel was allowed to withdraw as Petitioner's counsel pursuant to a motion filed in this court. All of Petitioner's complaints about post-conviction counsel discussed in this opinion refer to Petitioner's initial counsel and not to counsel currently representing Petitioner.

Initially, the State argues that Petitioner's notice of appeal is a "nullity" because he filed his *pro se* notice of appeal while still represented by counsel, and therefore, his appeal is not properly before this court. It has long been the rule that a defendant may not be represented by counsel and simultaneously proceed *pro se. State v. Davis*, 141 S.W.3d 600, 615-16 n. 12 (Tenn. 2004); *State v. Burkhart*, 541 S.W.2d 365, 371 (Tenn. 1976). However, as acknowledged by the State, Tenn. R. App. P. 4 provides that "in all criminal cases the 'notice of appeal' document is not jurisdictional, and the filing of such document may be waived in the interest of justice. Tenn. R. App. P. 4 (a). "In determining whether waiver is appropriate, this [c]ourt will consider the nature of the issues presented for review, the reasons for and the length of the delay in seeking relief, and any other relevant factors presented in the particular case." *Gerry Hoover v. State*,

No. M2011-02413-CCA-R3-PC, 2012 WL 4841608, at *3 (Tenn. Crim. App. Oct. 10, 2012).

In his reply brief, Petitioner asserts that the reason for filing a *pro se* notice of appeal was because of the "extremely poor communication between he and his initial post-conviction counsel as demonstrated throughout the record." This is supported by the record. As pointed out by Petitioner in his reply brief, initial post-conviction counsel made the following statement at the post-conviction hearing: "And I will be the first to admit, [Petitioner], and I think I said this on the record before, certainly has a decent claim that I had not communicated well with him." Petitioner's initial post-conviction counsel also filed a motion to withdraw as counsel after the *pro se* notice of appeal was filed indicating that initial post-conviction counsel was unable to continue to maintain his legal practice. His motion states the following:

> As a direct and proximate result of the unceasing, unmitigated and utterly unmanageable requirements of attorney time and money necessarily expended by undersigned counsel stemming from the unrelenting and continuous appointment(s) of undersigned counsel (often in direct contravention of Tennessee Supreme Court Rule 13) to indigent defendants throughout the 22nd Judicial District and beyond; your undersigned counsel is no longer able to maintain a legal practice.

We note that Petitioner's notice of appeal in this case, if such a filing was appropriately filed by counsel, was timely. The order denying Petitioner's petition for post-conviction relief was filed on July 2, 2018, and Petitioner's *pro se* notice of appeal was filed on July 12, 2018. Because the *pro se* notice of appeal was timely filed, and due to the lack of communication between Petitioner and his initial post-conviction counsel, we waive the timely filing of the notice of appeal in the interest of justice. *Gerry Hoover*, 2002 WL 4841608, *3; *see also State v. Markettus L. Broyld*, No. M2005-00299-CCA-R3-CO, 2005 WL 3543415, at *1 (Tenn. Crim. App. Dec. 27, 2005).

To obtain post-conviction relief, a petitioner must prove that his or her conviction or sentence is void or voidable because of the abridgement of a right guaranteed by the United States Constitution or the Tennessee Constitution. T.C.A. § 40-30-103 (2019); *Howell v. State*, 151 S.W.3d 450, 460 (Tenn. 2004). A post-conviction petitioner bears the burden of proving his or her allegations of fact by clear and convincing evidence. T.C.A. § 40-30-110(f) (2019); *Dellinger v. State*, 279 S.W.3d 282, 293-94 (Tenn. 2009). "Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Grindstaff v. State*, 297 S.W.3d 208, 216 (Tenn. 2009) (quoting *Hicks v. State*, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998)).

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. When a claim of ineffective assistance of counsel is made, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Lockhart v. Fretwell*, 506 U.S. 364, 368-72 (1993). Failure to satisfy either prong results in the denial of relief. *Strickland*, 466 U.S. at 697. Accordingly, if we determine that either factor is not satisfied, there is no need to consider the other factor. *Finch v. State*, 226 S.W.3d 307, 316 (Tenn. 2007) (citing *Carpenter v. State*, 126 S.W.3d 879, 886 (Tenn. 2004)). Additionally, review of counsel's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689; *see also Henley v. State*, 960 S.W.2d 572, 579 (Tenn. 1997). We will not second-guess a reasonable trial strategy, and we will not grant relief based on a sound, yet ultimately unsuccessful, tactical decision. *Granderson v. State*, 197 S.W.3d 782, 790 (Tenn. Crim. App. 2006).

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996) (citing *Strickland*, 466 U.S. at 688; *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the test is satisfied by showing a reasonable probability that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is a "probability sufficient to undermine confidence in the outcome" of the trial. *Id.* The stronger the proof of guilt presented at trial, the more difficult it is to prove the prejudice prong of *Strickland*. When proof of guilt is overwhelming, proving prejudice is exceedingly difficult. *See Proctor v. State*, 868 S.W.2d 669, 673 (Tenn. Crim. App. 1992); *Randy Bray v. State*, No. M2011-00665-CCA-R3-PC, 2012 WL 1895948, at *6 (Tenn. Crim. App. May 23, 2012) (finding that, in light of overwhelming evidence, petitioner could not demonstrate prejudice); *Raymond E. McNeil v. State*, No. M2010-00671-CCA-R3-PC, 2011 WL 704452, at *6 (Tenn. Crim. App. Mar. 1, 2011) (finding that overwhelming evidence of guilt precluded showing of prejudice from admission of item of evidence at trial).

Petitioner first argues that trial counsel rendered deficient performance by failing to inform him of the deadline set by the trial court for accepting the State's plea offer. The post-conviction court summarized the evidence presented at the post-conviction hearing concerning this ground and concluded:

> The Court finds [trial counsel] to be a knowledgeable attorney, experienced in criminal law and procedure. The Court finds his testimony credible. The Court has no doubt that [trial counsel] explained

> to [Petitioner] the deadline for accepting a plea agreement and entering a plea.
>
> Also, the Court is not aware that it is bound or compelled to accept any plea agreement tendered to it.
>
> The deadline for tendering a plea ran; the case was docketed for trial; and [Petitioner] was convicted. Now, it appears to the Court that [Petitioner] wishes he had accepted the plea agreement.

The record in this case does not preponderate against the post-conviction court's factual findings. At the post-conviction hearing, trial counsel testified that he timely communicated the State's plea offer to Petitioner, and he informed Petitioner that there was a settlement date in the case. Trial counsel asserted: "And that's really one of the main points that I spoke to [Petitioner] about." He noted that he later spoke with Petitioner during a visit at the Turney Center prison about the plea offer and reminded him of the plea deadline. Trial counsel's testimony is supported by the trial court's scheduling order, issued the day after arraignment, which specifically set a deadline for the acceptance of plea offers. Additionally, trial counsel's motion to withdraw contains the following language:

> Undersigned counsel received an offer from Assistant District Attorney Brent Cooper and undersigned counsel conveyed that offer to the defendant and told the defendant that this Court required defendants to accept and enter into plea agreements roughly one month prior to the scheduled trial date. Undersigned counsel further explained to the defendant that if a criminal defendant did not so timely enter into a plea agreement, that this Court would only allow such a defendant to either, one, plead guilty to all charges in the indictment and have a subsequent sentencing hearing, in other words a blind plea, or have a jury trial.

The post-conviction court specifically found that trial court's testimony was more credible and essentially concluded that Petitioner failed to prove his allegations of fact by clear and convincing evidence. This court will not re-weigh or re-evaluate the credibility determinations made by the post-conviction court. All questions concerning the credibility of witnesses, the weight and value to be given their testimony and the factual issues raised by the evidence are to be resolved by the trial court, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999). Petitioner is not entitled to relief on this basis.

Next, Petitioner asserts that he expressed "absolute frustration" and "dissatisfaction" on the morning of his trial with trial counsel and requested new counsel. The trial court denied Petitioner's request but appointed co-counsel to sit with trial

counsel throughout the trial. Petitioner argues that "if the court believed the remedy to a conflict between appointed counsel and his client was to appoint co-counsel, the court should have ordered a continuance to allow co-counsel time to prepare." However, this issue was not raised in Petitioner's amended post-conviction petition. Although Petitioner raised the issue of co-counsel being appointed in his original petition, the issue was abandoned in his amended petition. There was no evidence presented at the post-conviction hearing in support of this issue other than trial counsel's testimony he did not recall co-counsel being in any way involved at Petitioner's trial. There was no testimony about a continuance presented at the post-conviction hearing. Co-counsel did not testify at the post-conviction hearing, and the post-conviction court made no findings on this issue. The post-conviction hearing is limited to issues raised in the petition. Tenn. Sup. Ct. R. 28, § 8(D)(4). Since this ground for relief was abandoned in the amended petition, and no proof was presented at the post-conviction hearing on this specific ground, this issue is waived.

Additionally, this issue is not cognizable in a post-conviction proceeding and should have been raised on direct appeal. "A post-conviction petition is not a vehicle to review errors of law as a substitute for direct appeal." *French v. State*, 824 S.W.2d 161, 163 (Tenn. 1992); *see* T.C.A. § 40-30-106(g) ("A ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented . . ."). Petitioner is not entitled to relief on this issue.

Finally, Petitioner contends that the State's informant and witness, Kevin Odie, committed perjury at Petitioner's trial by testifying that he had not been promised anything by the State in exchange for his cooperation. In the case of *Travis Lindsey*, which Petitioner read after he was denied relief on direct appeal, Petitioner learned that Mr. Odie's bond for his own charges had been reduced from $100,000 to $2,500 so that he could work for police as an informant. Therefore, Petitioner argues, the State allowed perjured testimony at Petitioner's trial and violated *Brady v. Maryland*, 373 U.S. 83, 87 (1963) by not informing trial counsel of the bond arrangement with Mr. Odie.

Initially, the State argues that this issue is waived because Petitioner withdrew this claim in his amended post-conviction petition filed by post-conviction counsel. As previously discussed, the post-conviction hearing is limited to issues raised in the petition. Tenn. Sup. Ct. R. 28, § 8(D)(4). A post-conviction court "may allow amendments and shall do so freely when the presentation of the cause will otherwise be subserved." Tenn. Sup. Ct. R. 28, (D)(5); *Smith v. State*, 357 S.W.3d 322, 658 n. 6 (Tenn. 2011) (the post-conviction court has "discretion to allow free amendment of post-conviction petitions"); *See also James Patrick Stout v. State*, No. W2011-00277-CCA-R3-PD, 2012 WL 3612530, at *58 (Tenn. Crim. App. Aug. 23, 2012). Although Petitioner abandoned the claim concerning Mr. Odie's alleged perjured testimony in his amended post-conviction petition, and the post-conviction court did not make specific

findings concerning this ground for relief, evidence, though scant, was presented at the post-conviction hearing on this ground.

As to this ground for relief, Petitioner has failed to meet his burden of proof. To prove a *Brady* violation, a defendant must demonstrate that 1) he requested the information (unless the evidence is obviously exculpatory, in which case the state is bound to release the information whether requested or not); 2) that the state suppressed the information; 3) that the information was favorable to the defendant; and 4) that the information was material. *Johnson v. State*, 38 S.W.3d 52, 56 (Tenn.2001). The evidence is deemed material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985). A *Brady* claim in a post-conviction proceeding is "governed by the same prejudice standard as an ineffective assistance of counsel claim." *Cauthern v. State*, 145 S.W.3d 571, 599 (Tenn. Crim. App. 2004). "[A] defendant must show that there is a reasonable probability that the result of the proceedings would have been different." *Id.* at 598-99.

Concerning false testimony, this court has held:

"[A] conviction obtained through the use of false evidence, known to be such by representatives of the State" deprives a defendant of due process. *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959); *see also Giglio v. United States*, 405 U.S. 150, 153, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972); *State v. Spurlock*, 874 S.W.2d 602, 617 (Tenn. Crim. App. 1993). "The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Napue v. Illinois*, 360 U.S. at 269, 79 S.Ct. at 1177. Therefore, when a witness testifies falsely, either on direct or cross-examination, the state has an affirmative duty to correct such false testimony. *State v. Spurlock*, 874 S.W.2d at 617.

To prevail on a claim that the state knowingly presented false testimony, the [Petitioner] must show by a preponderance of the evidence "(a) that false or perjured testimony was admitted at trial, (b) that the state either knowingly used such testimony or knowingly allowed it to go uncorrected, and (c) that the testimony was material and deprived him of a fair trial." *Roger Morris Bell v. State*, C.C.A. No. 03C01-9210-CR-00364, 1995 Tenn. Crim. App. LEXIS 221, at *9, Hamilton County (Tenn. Crim. App. filed March 15, 1995, at Knoxville), *perm. to app. denied* (Tenn. August 28, 1995); *see also Phillip Shupe v. State*, C.C.A. No. 03C01-9804-CC-00126, 1999 Tenn. Crim. App. LEXIS 111, at *4, Bradley County (Tenn. Crim. App. filed February 9, 1999, at Knoxville).

*James H. Register v. State*, No. 01C01-9605-CC-00199, 1999 WL 333114, at *6 (Tenn. Crim. App. May 26, 1999); *see also Demarcus Ant-Juan Nelson v. State*, No. E2017-01418-CCA-R3-PC, 2018 WL 6721986, at *13 (Tenn. Crim. App. Dec. 21, 2018).

As pointed out by the State, trial counsel was not questioned about this issue at the post-conviction hearing to determine what he knew or did not know about Mr. Odie's bond reduction. Also, the trial prosecutor was not called as a witness. The only proof presented was Petitioner's testimony that he read the *Travis Lindsey* case and learned of the bond reduction. He further asserted that the State should have corrected Mr. Odie's perjured testimony at his trial and that the State knew that "deals" had been made with Mr. Odie, and Petitioner's trial counsel should have known of the deals. Petitioner believed that Mr. Odie's dishonesty on the witness stand about the bond reduction was one of Petitioner's "greatest arguments" on post-conviction and would have affected the outcome of his case. However, Petitioner failed to show that the State suppressed the information or knowingly used false information. As argued by the State in its brief, trial counsel could have possessed the information about Mr. Odie's bond arrangement but chose not to use it. Additionally, it is not clear from the record that Mr. Odie actually committed perjury. Mr. Odie was asked at Petitioner's trial only if he was "promised anything" in exchange for working with the State. *Brian Pillow*, 2016 WL 1270263, at *2-3. It appears that the purpose of this line of questioning was to determine whether Mr. Odie was promised a favorable settlement of his own pending criminal charges. He admitted at Petitioner's trial that he was seeking favor with the State but had no deal in place. This testimony was not false. Petitioner also has not demonstrated that Mr. Odie's bond reduction was material to Petitioner's case since the jury was already aware that Mr. Odie had motivation to lie in order to help his own case. Furthermore, as pointed out by the State, the revelation of Mr. Odie's bond reduction in the *Lindsey* case did not help the defendant in that case who was convicted of similar drug offenses as Petitioner. *Travis Lindsey*, 2016 WL 5937835, at *1. Petitioner is not entitled to relief on this issue.

## CONCLUSION

Based on the foregoing, the judgment of the post-conviction court is affirmed.

_____
THOMAS T. WOODALL, JUDGE

- 15 -